Amedeo GIRARDI, doing business as Girardi Bearing Company, Appellant,

v.

The GATES RUBBER COMPANY SALES DIVISION, INC., Appellee.

No. 18008.

United States Court of Appeals
Ninth Circuit.

Nov. 21, 1963.

Rehearing Denied Dec. 31, 1963.

Joseph L. Alioto, and G. Joseph Bertain, Jr., San Francisco, Cal., for appellant.

Dayton Denious, Denver, Colo., Heller, Ehrman, White & McAuliffe, and Lawrence C. Baker, San Francisco, Cal., for appellee.

Before CHAMBERS, Chief Judge, and POPE and BARNES, Circuit Judges.

POPE, Circuit Judge.

This is a private treble damage suit under the antitrust laws. (Sec. 4 of the Clayton Act, 15 U.S.C. § 15). The appellee, here called Gates, is and has been at all times referred to herein, engaged in the business of manufacturing and distributing belts and pulleys which were commonly used for the transmission of power to various machines. Its business involved trade in commerce between California and other States of the United States.[1] The principal charge made against it by appellant was that it conspired with another to fix resale prices in violation of Sec. 1 of the Sherman Act (15 U.S.C. § 1).

The appellant Girardi had been in the business of distributing power transmission equipment, including belts and pulleys, since 1944. He first had a store at Stockton, California, which was operated by Girardi and one Jones as partners. In 1950 the partnership was dissolved and Jones formed a partnership for the carrying on of the same type of business with one Les C. Oranges who apparently had bought out Girardi's interest in the original store. Girardi then in 1950 opened a similar business in Salinas, California, another in Modesto, California, and a third in Stockton, California. The Oranges-Jones partnership was dissolved prior to 1953. At that time Jones set up his own transmission business so that by the end of 1953 Girardi, Oranges and Jones were each engaged competively in that business. Each of them was then a distributor of Gates' line of belts and pulleys. The evidence in the record indicates that at that time Oranges, who was known as a "stocking jobber" of the Gates line, had become a leading distributor of these products.

Gates supplied its jobber distributors, including Girardi, with its catalog containing a schedule of prices for sale of the Gates products. Oranges invariably adhered to these prices. Girardi had such a catalog as early as March, 1951, and he followed the suggested pricing schedule until January or February, 1954. In January, 1954, he sent out to the trade a letter advising prospective customers as follows: "This is to inform you of a change in our monthly cash discount. We have found it advisable to increase our cash discount from the present 2% 10th prox. to 10% 10th prox. This increase will become effective as of the first of February, 1954. You will continue to receive your authorized factory discount on all our merchandise. We are factory representatives throughout the Valley for the Fort Worth Power Transmission Company and carry a substantial stock of removable hub sprockets, pulleys, belts and chain. We are ready to serve you. * * * * "[2]

---

1. The home office of Gates was at Denver, and the sales referred to in the opinion were handled between the Denver office and the several California jobbers here referred to.

2. The copy of this letter which was received in evidence read "—%" in place of "10%", but Girardi testified that the letter he mailed out advised that the new discount would be 10%.

This letter came to the attention of the Gates salesman who in January, 1954, discussed with Girardi this letter and the fact that Girardi had taken on a rival (Fort Worth) line of pulleys and belts. According to the testimony of Girardi, the salesman, one Price, stated, "What's this, you going out and giving 10% cash discount to people?" He said that Price also told him, "If you don't quit that, in 30 days you will be cancelled." Price denied that he made the quoted statements, although he admitted that he had questioned Girardi on that occasion respecting the matter of the 10% cash discount. At any rate, on April 6, 1954, Gates wrote to Girardi cancelling its contracts with the latter for the supply of Gates products for Girardi's Modesto and Stockton stores.

The letter cancelling Girardi's contracts stated that the contract for the furnishing of the Gates goods for the Salinas store would be kept in force only if the goods there handled were not sold outside the immediate Salinas trading area.[3] On May 24, 1954, Gates cancelled the Salinas contracts.

The complaint alleges that the defendant Gates cancelled these contracts of distribution and refused to deal with the plaintiff pursuant to its plan and agreement to control and regulate resale prices charged by its distributors;[4] that this agreement to regulate resale prices was done pursuant to a combination and agreement between the defendant and its distributors throughout the State of California in order to fix, stabilize and establish resale prices for the products of the defendant. This conduct, the complaint states, injured the business of Girardi; that this conduct was in violation of the antitrust laws; and the plaintiff prayed for recovery of three times his damages which he alleged were $35,-000.

Although the complaint alleged that this was a combination and agreement between Gates and its distributors throughout the State of California, counsel for the plaintiff in the court below stated that plaintiff's effort was limited to an undertaking to show that "there was a conspiracy between Mr. Oranges and the Gates Company." At the conclusion of the plaintiff's evidence a motion was made to dismiss the action because of the plaintiff's failure to establish a prima facie case as to conspiracy and because the court would not be warranted in submitting the case as made to the jury. The motion was sustained and judgment of dismissal of the action followed.

Upon this appeal Gates asserts that even if it were permissible to infer from the evidence that Girardi was cancelled because of his refusal to adhere to retail prices fixed by Gates, this falls short of proving any conspiracy or concerted action, and that all that was established was that Gates through solely unilateral action merely exercised the right recognized in United States v. Colgate & Company, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992—"the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell."

The proof that is necessary to make a case of the sort appellant attempted to establish here, is very thoroughly discussed in United States v. Parke, Davis & Co., 362 U.S. 29, 39, 80 S.Ct. 503, 509, 4 L.Ed.2d 505. Quoting from its earlier decision in United States v. A. Schrader's Son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471, the Court said: " * * * there is unlawful combination where a manufacturer 'enters into agreements— whether express or implied from a course of dealing or other circumstances—with all customers * * * which undertake

---

3. Apparently the 10% discount letter was sent to Girardi's customers in the Modesto and Stockton area but not to those in the Salinas trading area.

4. The complaint also alleged that the cancellation took place because Girardi dealt in competitive merchandise.

to bind them to observe fixed resale prices.'" The Court held that it is unnecessary in order to show an unlawful combination to prove that it arises from a price maintenance agreement, express or implied. The Court said that "such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy. * * * When the manufacturer's actions, as here, go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, this countervailing consideration is not present and therefore he has put together a combination in violation of the Sherman Act. Thus, whether an unlawful combination or conspiracy is proved is to be judged by what the parties actually did rather than by the words they used." 362 U.S. at 43–44, 80 S.Ct. at 511, 4 L.Ed.2d 505.

Fundamental to all this is the rule of United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129, that "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*" [5]

From this it seems plain that if Oranges, a competitor of Girardi, objecting to the latter's cutting of the prices suggested by Gates in its catalog, persuaded Gates to cancel Girardi, or cooperated with it in eliminating Girardi from the field because of his price cutting, then Girardi would have made a sufficient case

to require the questions of fact to be submitted to the jury, and it would be error to dismiss the action as was done here.

The concerted action which the plaintiff undertook to prove in this case was simple and uncomplicated. It was not asserted that there was extensive and massive concerted action by a group of manufacturers or producers of similar merchandise or products seeking to fix or stabilize sale prices generally.[6] It is not claimed that Gates' disciplinary action was brought to bear upon numerous jobbers or dealers.[7] There is no claim of an elaborate and extensive plan for espionage of the practices of dealers and jobbers, and there was no scheme for checking and keeping track of resale prices.[8] There is no claim that Gates' share of the market was a major one, though of course it was the only source for Gates belts and sheaves. All that is claimed is that one single stocking jobber, Girardi, was eliminated from the handling of Gates' products at the instance of Oranges, Girardi's competitor, and this because Girardi was cutting prices. We are unable to perceive any reason why the simplicity and limited scope of the actions alleged to have been taken here would prevent the application of the rule of United States v. Socony-Vacuum Oil Co., quoted supra. Indeed, in the Socony-Vacuum case (310 U.S. at 224, 60 S.Ct. at 811, 84 L.Ed. 1129), the Court said: "Monopoly power * * * is not the only power which the Act strikes down, as we have said. Proof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that

5. See also the following statement in White Motor Co. v. United States, 372 U.S. 253, 260, 83 S.Ct. 696, 700, 9 L. Ed.2d 738: "Price-fixing arrangements, both vertical (United States v. Parke, Davis & Co., 362 U.S. 29 [80 S.Ct. 503, 4 L.Ed.2d 505], Dr. Miles Medical Co. v. [John D.] Park & Sons, 220 U.S. 373 [31 S.Ct. 376, 55 L.Ed. 502]) and horizontal (United States v. Socony-Vacuum Oil Co., 310 U.S. 150 [60 S.Ct. 811, 84 L.Ed. 1129], Kiefer-Stewart Co. v. Sea-

gram & Sons, 340 U.S. 211 [71 S.Ct. 259, 95 L.Ed. 219]), have also been held to be *per se* violations of the antitrust laws; * * *."

6. As in Interstate Circuit v. U. S., 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610.

7. As in United States v. Parke, Davis & Co., supra.

8. As in Federal Trade Comm. v. Beech-Nut Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307.

result is proof of the completion of a price-fixing conspiracy under § 1 of the Act."

The situation here is similar to that referred to by the Court in Klor's v. Broadway-Hale Stores, 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741, where, after referring to the conduct of the defendants as having a "monopolistic tendency", the Court said: "As such it is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups. In recognition of this fact the Sherman Act has consistently been read to forbid all contracts and combinations 'which "tend to create a monopoly," ' whether 'the tendency is a creeping one' or 'one that proceeds at full gallop.' "

It seems to us to be clear that if the facts here, as claimed by the appellant, are that Oranges as a competitor of Girardi, the price cutter, induced and participated in action which resulted in Girardi being cut off from a supply of this merchandise, then the case would be precisely within the rationale of United States v. Socony-Vacuum Oil Co., supra, for it is normally the competitor who is being hurt by price cutting who is likely to seek coercive action against the competitor who is hurting or likely to hurt him. We would think that a typical case of illegal conspiracy to fix prices would arise from the desire of one dealer to eliminate his price cutting competitor through concerted action with the manufacturer. The simplicity of the case claimed by the appellant is no argument against him.

■ Of course, in a case of this kind, it is hardly to be anticipated that either the officers of the appellee, or Oranges himself, would come forward to testify saying in substance: "Yes, we agreed that this competition through price cutting on the part of Girardi should be eliminated and that Girardi's jobber contracts should be cancelled because of his insistence upon these documents." Obviously, whether there was such concerted action by Gates and Oranges may be proven by circumstantial evidence; indeed, such is the only manner in which a case of this kind could ordinarily be established.[9]

■ We turn then to the evidence adduced for the purpose of inquiring whether the proof as made was such as to warrant a jury to find that in fact a combination of the kind here referred to was made and carried into effect and resulted in the cancellation of Girardi's contracts.

The evidence shows that on February 5, 1954, a Mr. Pilcher, district manager for Gates, wrote to Gates in Denver a letter containing the following statement relating to Girardi and the market in the area here involved: "Our stocking jobbers are a little upset, not so much because we might allow him to take on a competitive line of sheaves, but because Girardi is breaking the market, which in the areas where he operates has been fairly stable. He is doing this by giving a 10% cash discount from the monthly statements to his customers."

Several inferences may be drawn from this letter: that Oranges, who was a stocking jobber, indeed the principal one,

9. "It is elementary * * * that conspiracies are seldom capable of proof by direct testimony and may be inferred from the things actually done, * * *." Eastern States Retail Lumber Ass'n. v. United States, 234 U.S. 600, 612, 34 S. Ct. 951, 954, 58 L.Ed. 1490. "[T]he essential agreement, combination or conspiracy might be implied from a course of dealing or other circumstances." Frey & Son v. Cudahy Packing Co., 256 U.S. 208, 210, 41 S.Ct. 451, 65 L.Ed. 892.

"As is usual in cases of alleged unlawful agreements to restrain commerce, the Government is without the aid of direct testimony that the distributors entered into any agreement with each other to impose the restrictions upon subsequent-run exhibitors. In order to establish agreement it is compelled to rely on inferences drawn from the course of conduct of the alleged conspirators." Interstate Circuit v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610.

was among those jobbers who "are upset"; that Oranges and the others were upset by Girardi's discount or price cutting; that Pilcher or some representative of Gates had discussed this price cutting with Oranges (otherwise the fact of the "upset" could not be known); that complaint had been made by these stocking jobbers including Oranges; that in making such complaint to Gates and its representatives they were seeking help from Gates to stop this price cutting.

Pilcher's letter also stated: "I have not decided to move positively against this situation but I should like to know just what some of your thinking might be." Obviously some action by Gates was then being contemplated.

We have noted above the testimony that Price, the salesman, had discussed this discount matter with Girardi, and that according to Girardi, Price had protested it and suggested that Girardi might be "cancelled" if he kept it up.

That there was discussion between Oranges and the representatives of Gates concerning this discount letter of Girardi prior to the time that Girardi contracts were cancelled appears from the testimony of Oranges himself. Oranges testified that at some time in the month of January, 1954, he received a copy of the discount letter; he was then asked whether after he received it he had a discussion with Mr. Price with reference to this letter. He answered: "That is quite possible."

In arriving at the significance to be attached to Oranges' testimony, (we shall refer to additional testimony shortly) the jury could properly consider that as an accused co-conspirator Oranges was definitely in the position of a hostile witness. Under the circumstances it would appear proper to construe his answer "that is quite possible" as an affirmative one.

Again Oranges was asked: "Do you recall whether or not you made a complaint to Mr. Price at that time that Girardi was cutting prices." The answer

was: "The subject probably was discussed." He was asked: "Do you recall whether or not in February, 1954 you were upset because Girardi was breaking the Market?" His reply was: "For a short time we were." [10] Asked further respecting his discussion with Price in the first part of February, 1954, Oranges testified as follows: "Q. And at that meeting you were concerned with the price cutting activities of Mr. Girardi. A. That is correct." He testified that the conversation pertained to the discount letter. "A. The discussion would be pertaining to prices. Q. And do you recall what you said and what Mr. Price said? A. Not exactly, no. It would be rather difficult to remember a conversation that far back. Q. Do you recall whether or not you stated to Mr. Price that Girardi was breaking the market? A. That would be difficult to say whether I put it in that many words or not, but the discussion was brought up about prices."

In this connection it should be noted that in the course of this testimony Oranges denied that he requested Gates to take any action against Girardi. Although he testified that after he got a copy of the discount letter he was upset for a time because Girardi was breaking the market, he also said that thereafter he discovered Girardi's price cutting was not harming him because Girardi was a business failure. He said: "Q. And did you make any suggestion to Mr. Price as to whether or not Gates had better do something about it? A. What Gates did with Girardi was no concern of ours, but we didn't figure Girardi Bearing as any contention. Q. Did you make any statement to Mr. Price that Gates should do anything about Girardi? A. No. Q. You didn't tell Mr. Price that they better cancel Girardi out? A. No, by no means. We weren't interested whether Mr. Girardi sold Gates, Worthington, or Ft. Worth. Q. Were you interested in whether or not Mr. Girardi was giving a 10% cash discount. A. We

10. Oranges testified that after he learned of Girardi's discount letter he went to the latter and protested his cutting prices.

were concerned a little at first. We discovered that concern was without foundation, that didn't matter."

It is plain that the jury were not obliged to accept as true the testimony last quoted or Oranges' assertion that he neither asked that Gates do something about Girardi's price cutting nor requested them to cancel Girardi's contracts. This is particularly true in view of Oranges' interest. If, as they might well do, the jury were to discount as untrue these assertions, the remaining evidence is sufficient to support an inference that Oranges did just the opposite—that he did suggest and request that Gates take the action which it did against Girardi.

It is quite clear from what we have previously noted that Oranges, and perhaps some other jobbers as well, complained to Gates about Girardi's price cutting. If Oranges complained, it would be a fair inference that his complaint was designed to get some action on the part of Gates. The very act of complaining carries the meaning: "I want you to do something about it." It seems to us that if Oranges was complaining, as Pilcher suggests in his letter, about Girardi breaking the market, he was making such complaint with a view of having Gates rid him of that competition.

The jury also would be permitted to infer that Gates had adopted a policy of refusing to sell its products to jobbers who did not adhere to a schedule of resale prices. The existence of such a policy, and Oranges' acquaintance with that policy, appears from a letter dated September 25, 1953, which Pilcher wrote to Price.

At that time Gates was considering giving a contract for Gates' products to the Jones Bearing Co. Oranges had registered some objection to this. He admitted that he was "a little disturbed" by the proposal to set Jones up as a competing dealer in Gates products. In the communication referred to Pilcher said to Price: "Les was not in a very good mood to receive my opinion that he would be better off with Jones handling Gates belts where we could exercise some control over his marketing practices than he would be were Jones compelled to take on one of the gyp lines and follow through with a price eroding marketing policy. However, you may be able to impress him with this point."

It thus appears that Pilcher had explained to Oranges that if Jones handled Gates belts it could be expected that Gates could exercise control over his marketing practices in such manner as to avoid a "price eroding marketing policy." Oranges would necessarily understand, as he already must have known, that Gates had a price scheduling program and one which it was in a position to control. More significantly, the jury could infer that Gates had adopted a policy of refusing to sell its products to those who did not adhere to a schedule of resale prices. In United States v. Parke, Davis & Co., supra, the Court noted the significance of such a policy in Federal Trade Comm. v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, saying: "In Beech-Nut the company had adopted a policy of refusing to sell its products to wholesalers or retailers who did not adhere to a schedule of resale prices." 362 U.S. at 40, 80 S.Ct. at 509, 4 L.Ed. 505.

It is well settled that in considering the question whether the evidence was sufficient to go to the jury, this court is "of course, bound to view the evidence in the light most favorable to [plaintiff] and to give [him] the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." Continental Ore. Co. v. Union Carbide, 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777.

That there was this concert of action to put Girardi out of business in the handling of Gates products is further evidenced by what these parties did to Girardi even after the latter's Stockton and Modesto contracts were cancelled by letter of April 6, 1954, giving 30 days notice of such termination. At that time Girardi's Salinas contracts had not been cancelled; they were cancelled on May 27, 1954. But in the interim Girardi was

ordering Gates products, belts and sheaves. That he was attempting to do so must have become known to Gates' jobbers at Stockton (that would be Oranges and Jones) for there is evidence that they immediately "put a lot of pressure" upon Gates to refuse this merchandise to Girardi. On April 30, 1954, Pilcher wrote to Gates' assistant sales manager at Denver as follows:

"Jack, I spent yesterday up at Stockton and will not dictate two or three pages to describe to you what a hot-bed there is at that point. We have a case of all three of the primary belt jobbers hating one another and some of them are suspicious of us. There was a little rumor that Girardi was going to attempt to place a stock order with us before his contract expires on May 5, I have no intention of filling any stock orders for him. However, some one told me that Girardi shot an order in to Denver the other day. I haven't seen anything to confirm this, but just in case he does I do not want it filled under any condition. Will you please alert the necessary persons not to fill any orders whatsoever for any branch of the Girardi Bearing Co., whether it be for Stockton, Modesto, or Salinas.

"I think I am going to have to cancel out this Salinas deal without much more delay. * * * To further complicate the situation, old man Girardi is being quoted by our Stockton jobbers as having said that our cancellation of his contracts was of no concern or worry to him because he was the one who cut us off instead of us cutting them off, and furthermore, if he needed anything in our line he could still get it through his Salinas store. These Stockton jobbers are putting a lot of pressure on us to make this impossible for him."

When Pilcher testified at the trial, he stated that he could "not remember" any conversation with Oranges or Jones at Stockton on April 29, 1954, of the charac-ter referred to in the letter just quoted. Of course the jury, observing him and his manner of testifying and his interest could well disbelieve his testimony and believe that his written statement about "pressure" from "Stockton jobbers" was a true one. As against Gates, the statement in the letter is an admission of fact.

The correctness of what was stated in that letter is confirmed by the fact that shortly after this, on May 14, 1954, Girardi received a communication from Gates as follows: "Subject: Your purchase order #001674 attached. * * * We wish to advise that we are returning your order #001674. This step is necessary because your Jobber Contract has terminated and we can no longer accept your orders on a Jobber basis."

If, as the jury could well believe, "these Stockton jobbers" (Oranges and Jones) were at the end of April, 1954, putting "a lot of pressure" on Gates to cut off Girardi, that would be additional evidence that earlier that same month, when Gates first cancelled Girardi, Oranges was then also putting pressure on Gates to get rid of Girardi. A person's state of mind, his intention to accomplish a certain result, the existence of a conspiracy, is like any other condition which is the subject of proof in court. A subsequent existence of a certain condition may in proper circumstances, where the time lapse is brief, give rise to an inference that the same condition previously existed. The rule is as stated by us in Allen v. Matson Navigation Co., 9 Cir., 255 F.2d 273, 281, "Where the condition is of such character that a brief lapse of time would not affect it materially, the subsequent existence of the condition may give rise to an inference that it previously existed."

We think that the evidence in this case was sufficient to permit the jury properly to draw the inference that Oranges complained to Gates about Girardi's price cutting; that in making those complaints Oranges was expecting Gates to take action to put an end to that price cutting and thus relieve Oranges as Girardi's competitor from the adverse effects of a

price eroding policy on the part of Girardi; that Gates acquiesced in this and by its conduct carried out a program jointly with Oranges to put an end to this price erosion; that when Oranges sought assistance from Gates he knew of Gates' fixed policy of refusing to sell to those who did not adhere to its schedule of prices and expected that Gates would exercise the control over Girardi that Gates' representative indicated could be exercised over the marketing prices of Jones if Jones were given a contract.

It is therefore our view that the trial court was in error in taking the case from the jury and dismissing the action.[11]

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

BARNES, Circuit Judge (concurring).

While I do not and cannot agree with certain interpretations of the evidence relied upon by my brother Pope, it would serve no useful purpose for me to list them here.

This case comes before us by reason of the trial court having granted, after the plaintiff's case has been presented to a jury, a motion to dismiss. The district court thus held as a matter of law there was no sufficient substantial evidence of the conspiracy charged to go to the jury.

With this I cannot agree. There existed questions of fact that might well have been decided, either in favor of appellant or against him, upon a weighing of all the evidence by either a jury or judge acting as the trier of facts. I cannot agree there exists in the record no substantial evidence from which a conspiracy might not have been properly and legally infer-

red by such trier of fact, rather than a finding that a "Colgate" situation existed, giving the seller the sole discretion as to with whom he would or would not deal. And of course, we are required to view whatever evidence exists in the light most favorable to plaintiff and to give him the benefit of all inferences which are fairly supported by the evidence, even though we, as triers of fact, might arrive at a contrary conclusion.

I concur.

11. No contention is made that Gates is protected under the minimum resale price proviso of § 1 of the Sherman Act because of the California Fair Trade Act (California Business and Professions Code, §§ 16900–16905). Such contention could not be made for there is no allegation or proof that Gates had any minimum price agreement of the kind there referred to.

The conclusion we have reached here makes it unnecessary to consider whether there may have been another respect in which there was evidence of a violation of § 1 of the Sherman Act; this because there was some evidence that Gates, in enforcing its price-fixing arrangement with Oranges, in effect may have imposed a boycott on Girardi. See Walker Distributing Co. v. Lucky Lager Brewing Co., 9 Cir., 323 F.2d 1.