**CARBON STEEL PRODUCTS CORP.,**
**Plaintiff,**

v.

**ALAN WOOD STEEL COMPANY,**
**Defendant.**

**No. 65 Civ. 319.**

United States District Court
S. D. New York.

Sept. 4, 1968.

---

Samuel Shapiro and Jack Flamhaft, New York City, for plaintiff.

Christy, Bauman, Frey & Christy, New York City, for defendant.

OPINION

TYLER, District Judge.

Alan Wood Steel Company ("Wood") is engaged in the manufacture of a variety of steel products in Pennsylvania. Carbon Steel Products Corp. ("Carbon Steel") is a wholesaler in the steel business, selling primarily steel plate to heavy industry in the New York City metropolitan area. The two parties contracted for the sale and delivery of approximately $500,000 of steel between 1959 and mid-1964. During those years, Carbon Steel purchased approximately six percent of its total requirements of steel plate from Wood; the balance of its requirements was acquired from other producers, domestic and foreign.

In April, 1964, Wood's district sales manager, Charles Schumacher, informed Carbon Steel's president, Jerome Greenbaum, that a certain submitted order

would not be accepted. The reason allegedly given was that Carbon Steel had been taking orders away from Wood by selling imported steel. A call by Greenbaum to Wood's vice-president in charge of marketing, Howard Read, appears to have temporarily settled the matter, and during the next few months several new orders of plaintiff were accepted by defendant. In August, however, Wood rejected two further orders, each time citing "sound business reasons". In response to a vigorous letter from Carbon Steel, Wood more particularly explained the refusal to fill any orders by referring to Carbon Steel's previous record of claims, its threat of litigation and its over-all business attitude toward Wood. Furthermore, Wood specifically denied that the cutoff resulted from Carbon Steel's continued purchases and sales of imported steel.

Carbon Steel has submitted copies of two inter-office memoranda, dated May 6, 1964 and July 30, 1964, in an attempt to show that the explanation given by Wood for its refusal to deal was incomplete. In substance, these memoranda drafted by Schumacher to the attention of Read and a Wood general manager recite that at least one of Wood's customers was complaining that Carbon Steel was selling Wood's factory seconds (which turned out to be Japanese imports with a pattern very similar to Wood's). The memoranda also state that other customers, knowing of the steel's true source, objected on the ground that they could not meet the low price Carbon Steel was able to charge for its imported steel. The earlier memorandum referred to Carbon Steel's purported policy of withholding payment any time a minor defect was found in a Wood shipment, while the later of the two took strong exception to Carbon Steel's salesmen's practice of stressing

the interchangeability of the imported steel and Wood's product. Both communications urged that all business relations with Carbon Steel be severed.

Early in 1964, Carbon Steel brought suit claiming various antitrust violations and asking treble damages in the sum of three hundred thousand dollars. In its complaint, plaintiff asserts that defendant's refusal to deal was caused solely by Carbon Steel's sale of imported steel. In addition, plaintiff asserts that defendant's action was part of a plan to monopolize or which tended to monopolize the market in steel plate within the area serviced by plaintiff. Defendant's answer denies the material allegations of the complaint.

Discovery having been made, Wood moves for summary judgment pursuant to Rule 56(b), Fed.R.Civ.P. The motion is granted, since I find there is no genuine issue as to any material fact and defendant is entitled to a judgment as a matter of law. See Dart Drug Corp. v. Parke, Davis & Co., 120 U.S.App.D.C. 79, 344 F.2d 173 (1965).

In general, a unilateral refusal to deal does not violate the antitrust laws so long as there is no purpose to create or maintain a monopoly. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Absent such monopolization, a party claiming an unlawful refusal to deal must rely on Section 1 of the Sherman Act, 26 Stat. 209 (1890), as amended, 15 U.S.C. § 1 (1964).[1] For there to be a violation of Section 1, there must be some form of joint action, a "contract, combination * * * or conspiracy", as well as an undue restraint of trade. House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867, 870 (2d Cir.1962). Though there is occasionally a dispute over the degree of restraint imposed by a purportedly unilateral refusal to deal,

1. Section 3 of the Clayton Act, 38 Stat. 731 (1914), 15 U.S.C. § 14 (1964), cannot be relied upon directly by Carbon Steel because of the requirement therein of a lease, sale or contract, all of which are invariably absent in a unilateral re-

fusal to deal. See Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911, 914-915 (5th Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).

see Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (U.S. March 4, 1968) (dissenting opinion), more often the point of contention is whether any form of joint action can be found in the dealer's practices.

■ In United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed. 2d 505 (1960), the Supreme Court ruled that the combination requirement of Section 1 was satisfied where a dealer's "wholesalers and retailers [are entwined] in a program to promote general compliance with its price maintenance policy * * *." Id. at 37, 80 S.Ct. at 508. On the other hand, a dealer's conduct which does not "go beyond mere announcement of his policy and the simple refusal to deal" and is not supplemented by "other means" calculated to effect adherence to the policy was said by the Court not to amount to an illegal combination. Id. at 44, 80 S.Ct. at 512.

■■ The record here fails to disclose any facts which support an inference that Wood went "beyond mere announcement of his policy and the simple refusal to deal * * *." Significantly, Wood had no general policy to block the sale of imports by its customers and no enforcement machinery to gain adherence to any such policy. Wood made no effort to implicate any third parties in the detection of customers selling imported steel, nor did it enlist the aid of third parties in attempting to dissuade Carbon Steel from continuing its sales of foreign steel. A combination violative of Section 1 of the Sherman Act cannot be implied from the fact that some of Wood's customers complained of Carbon Steel's practices, since it was the normal working of the marketplace for them to have done so. Cf. Klein v. American Luggage Works, Inc., 323 F. 2d 787, 791 (3d Cir.1963).

■ The record also indicates that it was not Wood's policy to discontinue business relations simply because of a customer's sale of imported steel. Thus, as suggested by the inter-office memoranda, there were undoubtedly a number of "good business reasons" why Carbon Steel's business was no longer desired by Wood.

■ Even assuming that the sole reason for Wood's refusal to deal was Carbon Steel's competitive sale of imported steel, Wood was well within its rights. As noted by the D.C. Circuit Court, in a case involving a refusal to deal motivated by the customer's discounting practices and its assistance of the government in an antitrust action against the manufacturer:

"To establish the illegality of * * * [a refusal to deal] under Section 1, it is not enough to prove that its motivation was that of punishment for discounting or anything else, however reprehensible."

Dart Drug Corp. v. Parke, Davis & Co., supra at 344 F.2d 186. See House of Materials, Inc. v. Simplicity Pattern Co., supra at 298 F.2d 870.

■ In a recent Supreme Court decision, it was suggested that a combination could be found between the plaintiff and defendant involved in a "unilateral" refusal to deal dispute, "at least as of the day * * * [the party cut off] unwillingly complied" with his supplier's demands. Albrecht v. Herald Co., supra at 88 S.Ct. 872 n. 6. Carbon Steel cannot avail itself of this theory, however, since there is no indication that it ever discontinued its practice of selling imported steel.

■ Assuming it could be shown that defendant's unilateral refusal to deal embodied some form of a combination, that would not be of assistance to Carbon Steel in the context of this case, particularly as evidenced by the pre-trial discovery. The only restraint of trade which plaintiff can seriously contend existed was an attempt to exact an exclusive dealing arrangement. Even if Wood could be shown to have been so dealing, its practices would not run afoul of the antitrust laws because Carbon Steel has made no showing that the restraint of trade imposed would have been unreasonable. See Tampa Elec. Co.

v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); cf. Albert H. Cayne Equip. Corp. v. Union Asbestos & Rubber Co., 220 F.Supp. 784 (S.D.N.Y.1963). It is only in the case of a combination which is *per se* unlawful, such as one involving price fixing, where proof that the combination exists is all that is required to make out a cause of action. See, e. g., United States v. Parke, Davis & Co., supra.

Carbon Steel seeks to bring this case within the major limitation placed upon a manufacturer's right to unilaterally sever business relations by alleging that Wood is a monopolist. Plaintiff makes no attempt to spell out any relevant market,[2] however, or to specify what percentage of the market is controlled by Wood. Instead, plaintiff rests its allegation of monopolistic power on the following factors:

1. Defendant's delivered prices are lower for Carbon Steel than those of competing steel mills, since they include freight charges, and Wood's plant is closest to plaintiff's installation.

2. Various agencies of state and local government follow "buy-American" policies which preclude the sale of imported steel to those customers.[3]

3. Some of plaintiff's customers vastly prefer defendant's product to that of defendant's competitors.

This showing, plus the conclusory allegation of monopoly power is insufficient to bring Wood's practices into the proscribed category. See Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). As heretofore indicated, it is conceded that in fact plaintiff made significant purchases from a half dozen domestic manufacturers in the years in question, and from numerous foreign steel mills.

Neither the circumstance that defendant's prices were most favorable to plaintiff, nor the fact that defendant's products are preferred by plaintiff's customers[4] is sufficient to warrant the conclusion that Wood is a monopolist. The antitrust laws were not devised to maximize profits, but rather to enhance competition. Similarly, the difficulty in effecting sales of imported steel to state and local government agencies did not prevent Carbon Steel from selling nearly $2\frac{1}{2}$ times as much imported as domestic steel in the years 1963–1964. Where, as here, approximately 94 percent of the plaintiff's purchases were from sources other than Wood during the years in which they were dealing, the Second Circuit's remark in an analogous case that defendant's refusal to deal "necessarily created an added market for its competitors", House of Materials, Inc. v. Simplicity Pattern Co., supra at 298 F.2d 871, is particularly apt.

Though not alleged in the complaint, plaintiff raises the issue of a concerted boycott in its affidavit opposing summary judgment. Nothing factual is shown, however, in support of this conclusory allegation. In addition, plaintiff's president has conceded in his deposition that Wood is Carbon Steel's only source which has refused to continue dealing with plaintiff and that it has no evidence tending to prove a concerted boycott.

Defendant's motion for summary judgment is granted. Settle order and judgment.

---

**2.** It does concede, however, that there are at least a half dozen other domestic steel manufacturers, including United States Steel and Bethlehem Steel, which are factors in the New York City market.

**3.** See generally Note, California's buy-American policy: conflict with GATT and the Constitution, 17 Stan.L.Rev. 119 (1964).

**4.** In truth, this latter "fact" is by no means clearly established by the record— i.e., it is assumed *arguendo* for plaintiff's benefit.