**CARR ELECTRONICS CORPORATION, Plaintiff,**

**v.**

**SONY CORPORATION OF AMERICA, Defendant.**

**No. C–76–2741 AJZ.**

United States District Court, Northern District of California.

Feb. 28, 1979.

Bartholomew Lee, San Francisco, Cal., Furth, Fahrner & Wong, Frederick P. Furth, San Francisco, Cal., for plaintiff.

Feldman, Waldman & Kline, Murry J. Waldman, Matthew P. Mitchell, Patricia S. Mar, San Francisco, Cal., Rosenman, Colin, Freund, Lewis & Cohen, Asa D. Sokolow, Naomi G. Litvin, New York City, for defendant and counterclaimant Sony Corporation of America.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ZIRPOLI, District Judge.

Plaintiff Carr Electronics Corporation ("Carr") filed this suit against Sony Corporation of America ("Sony"), alleging that the latter had violated section 1 of the Sherman Antitrust Act, 15 U.S.C. section 1, by unlawfully engaging in a scheme to maintain the retail prices of color television sets that it manufactured and distributed to its dealers, including Carr. With discovery closed and trial less than three weeks away, Sony has moved the court for summary judgment on the plaintiff's antitrust allegations. For the reasons hereinafter stated, the court grants Sony's motion for summary judgment.

Prior to July 31, 1977, Carr was a dealer of Sony products. In the years preceding 1976, Sony availed itself of California's Fair Trade statutes, which permitted a manufacturer to dictate the minimum retail prices that dealers of its products might charge their customers. Effective January 1, 1976, the California Legislature repealed these statutes, making vertical price restraints subject to the general constraints of the antitrust laws. On and after that date, Carr and several other dealers whose operations were characterized by low overhead and high volume began to advertise prices substantially below the prices that had prevailed during the Fair Trade period. Plaintiff has introduced evidence tending to show that many of the dealers who sold Sony televisions as part of a general merchandise business, such as R. H. Macy Co. ("Macy's") and the Emporium Capwell Co. ("Emporium") complained forcefully to Sony that they were unhappy with the fact that several low-overhead dealers were underselling them;[1] in fact, one of the department stores accused the discounters of selling below cost.

Carr alleges that thereafter Sony, in concert with others, began to exert coercion upon Carr to raise the retail prices that it charged for color television sets. The coercion was allegedly manifested in several ways: in the later months of 1976, Sony is alleged to have withheld television sets from Carr despite Carr's timely orders; Sony declined to increase the amount of credit that it extended to Carr for the purchase of televisions; when Carr sought and obtained alternative credit from the General Electric Credit Corporation ("GECC"), Sony allegedly pressured GECC into terminating Carr's credit, which GECC in fact did in April of 1977; finally, in May of 1977, Sony notified Carr that Carr's contract of dealership would be terminated effective July 31, 1977, and in fact Carr was terminated on that date.

Carr offers three theories in support of its claim that Sony combined or conspired with others to impose vertical price restraints: (1) Carr claims that an explicit agreement between Sony and the major department stores, including Macy's, existed, and the existence of the agreement may be inferred from the fact that the dealers complained and Sony acted; (2) Carr claims that a "tacit" agreement existed between Sony and the other dealers, which agreement may be inferred from Sony's suggestions that retail prices designated by it be charged by the dealers, and the dealers' compliance therewith; or (3) that Sony enlisted the aid of GECC to enforce its policy of vertical price restraints.[2] While the court does not dispute the legal sufficiency of these allegations, the court grants Sony's motion for summary judgment because of Carr's inability to demonstrate, as it must on a motion for summary judgment, that it possesses facts sufficient to support the allegations.

---

1. Macy's was originally a defendant in this action, but Macy's and Carr reached a settlement in 1978, and Macy's was dismissed.

2. The GECC incident is offered by plaintiff primarily as an example of an act of coercion. If

Sony actually used this intermediary to carry out illegal goals, however, an illegal combination would exist. See *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

██ The court is mindful of the admonitions of the Supreme Court and the court of appeals that summary judgment should be used "sparingly in complex antitrust litigation . . ." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1973); *Cornwell Quality Tools Co. v. C.T.S. Co.,* 446 F.2d 825, 832 (9th Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972). The appellate courts have also recognized, however that "if an antitrust plaintiff, as well as any other plaintiff, does not present enough evidence within his case-in-chief to support a reasonable finding in his favor, a district court has a duty to direct a verdict in favor of the opposing party." *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1139–40 (9th Cir. 1974). The court concludes that this is the situation in the present case.

██ The Supreme Court has stated the guidelines for determining the existence of an antitrust violation. A manufacturer may decline to do business with whomever it chooses, so long as the refusal to deal is not part and parcel of an independent antitrust violation. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The manufacturer may not, however, engage others, such as wholesalers and distributors, to aid in the enforcement of the plan to terminate a dealer for the latter's refusal to charge the prices suggested by the manufacturer. *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Where other persons or entities are enlisted to assist in the coercion, a *per se* violation of section 1 of the Sherman Act has been committed. *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

The Court of Appeals for the Ninth Circuit has provided additional guidance for determining when a conspiracy vertically to restrain prices has been proved. In *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137 (9th Cir. 1974), the Ninth Circuit, relying on *Albrecht, Parke Davis,* and *Colgate,* noted that it was necessary for a plaintiff to prove both a conspiracy and coercion in order to state a claim under section 1 of the Sherman Act. 498 F.2d at 1140 n.6.

In the instant case, the court is clearly convinced that Carr has failed to make a case for any conspiracy or combination involving Sony that had as its purpose or effect the maintenance of retail prices.[3]

██ With respect to proof of a tacit conspiracy to fix retail prices, Carr would be required to show that either Carr itself or other dealers observed Sony's retail price suggestions on pain of retaliation. *Santa Clara Valley Distributing Co. v. Pabst Brewing Co.,* 556 F.2d 942 (9th Cir. 1977) (plaintiff failed to show that it had followed defendant's price suggestions); *Hanson v. Shell Oil Co.,* 541 F.2d 1352 (9th Cir. 1976) (no proof that other dealers followed retail price suggestions on pain of withdrawal of "dealer assistance" program). Carr has not offered any proof that any other dealer accepted a price suggestion for fear that

---

3. The court also finds Carr's evidence of coercion insufficient as a matter of law to survive a summary judgment motion. The only act of alleged coercion that without a doubt occurred was Sony's termination of Carr's dealership agreement. Sony claims that the purpose for this termination was its decision that it would rather not do business with a person who would surreptitiously record all telephone conversations he had with Sony. The evidence is undisputed that Carr's president and sole shareholder, Mr. Bruce Tognazzini, did precisely this in 1976 and 1977. About the time that Sony learned of the tape recordings, it both terminated Carr's dealership and filed a counterclaim alleging that Carr had violated Califor-

nia Penal Code section 632, and seeking statutory damages pursuant to California Penal Code section 637.2. On January 17, 1979, the court granted summary judgment on Sony's counterclaim.

While there may be a question of fact that this was really Sony's motive in the termination, the only evidence Carr offers for the conclusion that the termination was inspired by Sony's desire to maintain retail prices is the fact that prior to the termination many other dealers complained about Carr's pricing practices. For the same reason that such complaints are insufficient as a matter of law to evidence a conspiracy, they also fail to prove coercion.

Sony would limit its credit, obstruct other sources of credit, delay in filling its orders, or terminate its dealership agreement. In fact, Carr has not even offered to prove that other dealers followed Sony's retail price suggestions in any manner or for any reason. To the contrary, Sony has produced evidence that numerous Sony dealers within the relevant market area (the San Francisco Bay Area) had advertised Sony color televisions at prices at or below that advertised by Carr. Thus, no tacit agreement can be shown.

With respect to Sony's role in the termination of GECC financing, the only evidence that Carr puts forward is the deposition of one Mr. Tommy Green, a GECC employee, wherein it is stated that immediately prior to GECC's termination of Carr's financing, GECC employee Hoffman spoke on the telephone to Sony credit employee Perry. Sony does not dispute that the phone conversation occurred, and indeed admits that several such conversations had occurred in the preceding months.

The mechanics of the financing arrangement called for Sony to ship products to Carr upon GECC's approval of the proposed purchase. GECC would then pay Sony and Carr would be obligated to GECC. Sony charged Carr a three percent fee for handling the transaction through the outside financier, called a "flooring fee." When dealers obtain their financing directly from Sony through its "Finance America" credit division, Sony absorbs this charge, but, as a matter of policy, it requires all dealers with outside financing to pay for the flooring charges. Carr has not presented any evidence that the flooring charge was levied only against it, or only against dealers whose prices are below the suggested retail levels, or in any manner other than that suggested by its policy.

The deposition of Mr. Green, who did not participate in or overhear the conversations between Hoffman and Perry, contains Mr. Green's statement that the topic of conversation was the flooring charge. Sony does not dispute this, despite its hearsay character. Carr would ask the trier of fact to infer from (1) the fact of the phone call, (2) the fact that the flooring charges were discussed, and (3) the fact that GECC terminated Carr, the conclusion that Sony pressured GECC into terminating Carr. Such an inference cannot reasonably be drawn. The fact of the phone call is innocuous in the face of GECC's relationship with Sony in financing Carr's purchases. The fact that flooring charges were discussed is also not remarkable, in light of the fact that these were part of the charges GECC was being asked to pay.[4] The fact of the termination, to the extent that it requires an explanation, is sufficiently accounted for by GECC's complaints that Carr's inventory, in which GECC maintained a security interest, was moving so rapidly that GECC was fearful that it might be left unsecured. The court cannot reasonably infer that Sony persuaded GECC to terminate Carr's financing as punishment for Carr's unwillingness to adhere to suggested retail prices, nor could the court permit a jury to make that inference if this case were to go to trial.

The final theory upon which Carr asserts that a conspiracy can be found is that of an agreement between Sony and the large department stores such as Macy's. Carr asserts that the court must, as a matter of law, permit the inference that the complaints of the dealers, followed by Sony's termination of Carr, constitutes an illegal combination in violation of the antitrust laws. Carr relies heavily upon *Girardi v. Gates Rubber Co.*, 325 F.2d 196 (9th Cir.

4. The phone call is further explained by the fact that Carr and Sony were in dispute as to who would pay the 3% flooring charge. Carr claimed that Sony should continue to pay this cost, as it had when Sony had been providing the financing, and Carr therefore apparently instructed GECC not to pay Sony for this cost. Sony insisted that the charge was properly im-posed because of the aforementioned uniform policy of assessing the flooring charge when a dealer is receiving outside financing. GECC was obviously caught in the middle of this controversy, and thus it is entirely to be expected that Sony and GECC would discuss this subject.

1963), wherein the court of appeals held that the trial court erroneously granted defendant's motion for dismissal at the conclusion of plaintiff's case where plaintiff Girardi's contracts to retail pulleys and belts purchased from the defendant manufacturer Gates were cancelled in the wake of complaints by Girardi's competitor Oranges and other Gates distributors. The court noted:

> If Oranges complained, it would be a fair inference that his complaint was designed to get some action on the part of Gates. The very act of complaining carries the meaning: "I want you to do something about it."

325 F.2d at 202.

The facts of the *Girardi* case, however, are much more extreme than those of the instant case, and the court concludes that while the inference of an illegal combination in *Girardi* might have been reasonable, no such reasonable inference may be drawn here. First, one Price, a Gates salesman, had told Girardi that if he did not cease discount pricing, "in 30 days you will be cancelled." 325 F.2d at 198. No such threat was given to Carr in the present case.[5] Internal memoranda of Gates indicated that the complaints were given serious consideration, and that central management's thoughts on what course of action, if any, should be taken were solicited. 325 F.2d at 199–200. The same memorandum indicated that Oranges had previously suggested that Gates not take on one Jones as a distributor; a Gates official admitted informing Oranges that "he would be better off with Jones handling Gates belts where we could exercise some control over his marketing practices than he would be were Jones compelled to take on one of the gyp lines and follow through with a price eroding marketing policy." 325 F.2d at 202. The court commented that:

> It thus appears that Pilcher [a Gates employee, and the author of the memorandum] had explained to Oranges that if

Jones handled Gates belts it could be expected that Gates could exercise control over his marketing practices in such manner as to avoid a "price eroding marketing policy." Oranges would necessarily understand, as he already must have known, that Gates had a price scheduling program and one which it was in a position to control.

325 F.2d at 202. The inference that Gates had a price support program was further evidenced by the fact that Gates cut Girardi off in two geographical areas in which he engaged in discounting, but not in a third where no discounting occurred. When dealers complained that Girardi had not been punished enough—that is, that Gates had not made it "impossible for him" (325 F.2d at 203)—another internal memorandum indicated that the strong pressure from other dealers made it necessary to cut Girardi off in the final area before he could place another order. The next order was in fact declined by Gates.

Thus, it was on a much more forceful record that the *Girardi* court held that the jury should be permitted to infer a combination in violation of section 1 of the Sherman Act. The mere fact that dealers complained does not require sending the case to the jury, despite the appeal of some of the *Girardi* court's language.

The court is instead guided by the more recent language of the court of appeals, wherein that body stated that plaintiff must have "direct evidence to support its allegation that" defendant conspired with its distributor to coerce plaintiff into following the defendant's suggestions. *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1141 (9th Cir. 1974). On the subject of dealer complaints, the court has recently stated that:

> A combination violative of Section 1 of the Sherman Act cannot be implied from the fact that some . . . customers

---

5. One Larry Hill, a Sony salesman since deceased, had allegedly informed Tognazzini that Macy's and others were complaining, and that Sony intended to take some action. Hill's statement was not made as a threat in his capacity as a Sony employee, and in any case would not have been admissible at trial because it is double hearsay.

complained . . . since it was the normal working of the marketplace for them to have done so.

*Westinghouse Electric Corp. v. CX Processing Laboratories, Inc.,* 523 F.2d 668, 675 (9th Cir. 1975), quoting *Carbon Steel Products Corp. v. Alan Wood Steel Co.,* 289 F.Supp. 584, 588 (S.D.N.Y.1968). *Westinghouse,* like *Chisholm Bros.,* found that plaintiff's case was defective, because, among other reasons, there was no "direct evidence that the communication between [defendant] and its distributors was for the purpose of establishing a price-fixing agreement . . ." 523 F.2d at 674.

The court therefore concludes that the evidence upon which Carr relies is insufficient as a matter of law to support a reasonable inference that Sony conspired with Macy's or with any other dealer to terminate Carr in retaliation for Carr's discount pricing. There being no issue of material fact remaining in dispute, Sony Corporation of America's motion for summary judgment against Carr Electronics Corporation should be and hereby is granted. In light of this disposition, it is unnecessary for the court to pass on Sony's motion to exclude plaintiff's damage study and for the entry of a judgment pursuant to Rule 54(b), Federal Rules of Civil Procedure, on its counterclaim.