**A. G. ROGERS COMPANY**

v.

**MERCK AND COMPANY, INC.**

Civ. No. 3–79–451.

United States District Court, E. D. Tennessee, N. D.

May 29, 1980.

David E. Rodgers, John T. Johnson, Jr., Knoxville, Tenn., for plaintiff.

J. Douglas Overbey, Anne C. Greer, Knoxville, Tenn., for defendant.

MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This is an antitrust case premised on an alleged conspiracy involving the defendant to stabilize prices in the wholesale animal husbandry pharmaceutical market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. At the conclusion of plaintiff's case, defendant Merck & Co., Inc. (Merck) moved for a directed verdict under Fed.R. Civ.P. 50(a). In essence, Merck argues that there is no evidence of a contract, combina-

tion, or conspiracy involving Merck. Conceding that proof of such a conspiracy is essential to make out a § 1 violation (see *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911)), plaintiff A. G. Rogers Co. (Rogers) vigorously argues that evidence of a conspiracy does exist in the form of complaints to Merck from competitors of Rogers just prior to the termination of the distributorship, which forms the basis for this lawsuit.

This is a difficult case, and the Court appreciates the sincerity with which counsel for plaintiff has presented his side. However, for the reasons stated below, the Court is of the opinion that the defendant's motion must be sustained.

In deciding a motion of this kind, this Court must analyze all the evidence presented by the party opposing the motion, and must view that evidence in the light most favorable to that party. *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). Where, after such an analysis, it appears that there is no substantial evidence to support a verdict for the plaintiff, a directed verdict is proper. *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137 (9th Cir.), *cert. den.* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974).

Bearing these principles in mind, we shall now review the evidence. Defendant Merck is a manufacturer of animal health and feed products. In August, 1976, Merck and plaintiff entered into a non–exclusive distributorship agreement covering Tennessee, Kentucky and parts of Mississippi and Virginia. Depressed economic conditions in the animal husbandry industry and an incident of employee theft created financial problems for plaintiff who fell delinquent in its credit account with defendant in May and June, 1977. Despite these problems, defendant renewed the distributorship agreement for one year effective July 1, 1977, and a letter to plaintiff from Merck's credit manager dated November 30, 1977 indicated that at that time the credit problems were being worked out satisfactorily. (Ex. 11).[1]

On March 1, 1978, Rogers sent a letter to its customers announcing the initiation of a new sales program. Under this new program, plaintiff proposed to eliminate its manned sales force and to sell its products by mail order at a straight 6% over distributor cost. (Ex. 12). In conjunction with the new program, Rogers published and distributed a catalogue of available goods listing the suggested retail and dealer prices and distributor cost for each item. (Ex. 13).[2] The obvious effect of the dissemination of this information was to make known to all customers in the retail market the cost to distributors of the products listed.

James A. Ford, a Merck sales representative covering Rogers' territory, testified by deposition that he received several complaints from other distributors regarding Rogers' new program in April, 1978. Plaintiff introduced into evidence a letter to Mr. Ford from one of plaintiff's competitors dated May 5, 1978. (Ex. 18).[3] The letter states that some of the prices are out of date, and complains that Rogers' price publication "makes it very difficult for us to go

---

1. However, internal memoranda from James A. Ford, Merck's representative in plaintiff's area, strongly indicated that plaintiff was still in serious financial straights on November 5, 1977, and recommended "liquidation" of the account on November 25, 1977. (Ex. 19 and 20). While these facts do not form a basis of our decision, they do serve to develop a little more background. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F.Supp. 243, 256 (E.D.Pa. 1979).

2. The catalogue contained the same information for products of manufacturers other than Merck as well.

3. The body of the letter reads: We thought you might like to know what one distributor in this area is doing with your product these days.

    We hope you will take a good look at a company that is trying to destroy the market for animal health distributors.

    Not only have they sent out these order cards (enclosed) to all farmers and dealers in Ken-

in and sell at a profit." The letter concludes:

"You may not be able to do anything to prevent this, but we wanted you to know the situation first hand. . . . Anything you can do will be greatly appreciated by *all* animal health distributors in this area." (Emphasis in original.)

Merck terminated Rogers' contract by letter dated May 10, 1978. (Ex. 6).

Plaintiff claims that Merck terminated its distributorship pursuant to the complaints from plaintiff's competitors; that thus there was a contract, combination or conspiracy involving the defendant, whose purpose and effect was to stabilize retail animal pharmaceutical prices by eliminating plaintiff from the market; and that this conduct constitutes a *per se* violation of § 1 of the Sherman Act. Plaintiff relies on *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) and *Girardi v. Gates Rubber Company Sales Division, Inc.,* 325 F.2d 196 (9th Cir. 1963).

Defendant argues that the complaints alone cannot, as a matter of law, establish the existence of a contract, combination, or conspiracy. He relies on *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 478 F.Supp. 243 (E.D.Pa.1979).

*Parke, Davis, supra,* is clearly inapposite to the facts of this case. In that case, the evidence showed that Parke, Davis not only had announced a policy of refusing to deal with retailers who failed to observe its suggested minimum resale prices, but that in addition it had induced wholesale distributors to stop selling to offending retailers, 362 U.S. at 34, 80 S.Ct. at 506, and had secured unanimous adherence to its policy by informing a number of retailers that if

they cooperated, so would one of their major competitors. *Id.* at 36, 80 S.Ct. at 507. The Supreme Court held that the coercion evidenced by those facts went beyond permissible unilateral action sanctioned by the Court in *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

In the case at bar, there is no evidence that Merck initiated any communication with any of plaintiff's competitors on the subject of plaintiff's new sales program, let alone that it attempted to exercise the kind of leverage in the retail market evidenced in *Parke, Davis.*

The *Girardi* case, *supra,* appears comparable to this case at first glance, but a closer analysis reveals some significant distinctions. Plaintiff in that case was a distributor of power transmission equipment, with three locations in Central California. The defendant was a manufacturer of belts and pulleys who sold to plaintiff. In early 1954, plaintiff announced a policy of allowing a 10% discount in the sale of the defendant's products, which pushed the prices well below the defendant's published resale price schedule. There was evidence that the defendant had received complaints from plaintiff's competitors that they were "a little upset . . . because Girardi is breaking the market," 325 F.2d at 200; that defendant's salesman had threatened plaintiff with termination if he didn't stop offering the 10% discount, *id.* at 198; that the defendant had adopted a policy of refusing to sell to jobbers who did not adhere to its resale price schedule; and that defendant's Stockton jobbers were "put[ting] a lot of pressure" on defendant to stop selling to plaintiff. *Id.* at 202, 203. Moreover, when Gates took action, it initially terminated plaintiff's distributorships in only Stockton

---

tucky and Tennessee, they have now published a catalog with *all* distributor costs on thousands of products. Some prices such as the Tramisol prices are old and haven't been good since November 1977.

When our customers know what we are paying for a product it makes it very difficult for us to go in and sell at a profit.

You may not be able to do anything to prevent this, but we wanted you to know the situation first hand.

The customer who sent us the card is a large hog producer. A copy of both sides of the card is attached.

Anything you can do will be greatly appreciated by *all* animal health distributors in this area.

and Modesto where plaintiff was competing with the complaining jobbers, and *not* in Salinas where he was not.

It is thus clear from a close reading of the case that the Court did not rely solely on the complaints received by Gates in finding a jury issue. There was ample other evidence in *Girardi* to support a verdict for the plaintiff.

In the case at bar, the only evidence of concerted action introduced at trial was that of complaints received from defendant's distributors and the subsequent termination of the distributorship agreement. No evidence was introduced showing Merck's internal response to those complaints, other than the fact that Ford reported them to his superiors. *Cf. Girardi, supra* (evidence of planned responsive actions) with *Carbon Steel Products Corp. v. Alan Wood Steel Co.*, 289 F.Supp. 584 (S.D. N.Y.1968) (evidence showed only that defendant knew of complaints).[4] We cannot hold that complaints alone can constitute substantial evidence of a contract, combination or conspiracy necessary to make out a Section 1 violation. To do so would be to put virtually unlimited power in the hands of unscrupulous distributors intent on laying a foundation, perhaps in anticipation of impending legitimate termination, for a costly, burdensome, and otherwise unfounded antitrust suit. It would also serve to cut off communication between a seller and its customers so essential to the furtherance of the policy, embodied in the antitrust laws, of encouraging free competition in the marketplace. *See Klein v. American Luggage Works, Inc.*, 323 F.2d 787, 791 (3rd Cir. 1968); *Carbon Steel Products Corp., supra*, 289 F.Supp. at 588; *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F.Supp. 243, 257 (E.D.Pa.1979).

We agree with the Court in *Sweeney, supra*, that "evidence of competitor's com-

plaints standing alone cannot support a finding of liability under § 1 of the Sherman Act. *Westinghouse Electric Corp. v. CX Processing Laboratories*, 523 F.2d 668 (9th Cir. 1975); *Klein v. American Luggage Works, Inc.*, 323 F.2d 787 (2d Cir. 1963); *Carr Electronics Corp. v. Sony Corp. of America*, 472 F.Supp. 9 (N.D.Cal.1979); *Carbon Steel Products Corp. v. Alan Wood Steel Co.*, 289 F.Supp. 584 (S.D.N.Y.1968)." 478 F.Supp. at 255. There is simply no evidence that defendant's actions went "beyond mere announcement of his policy and the simple refusal to deal" or that he "employ[ed] other means which effect[ed] adherence to his [policies]." *United States v. Parke, Davis & Co., supra*, 362 U.S. at 44, 80 S.Ct. at 512. Merck did no more than to exercise its own right "freely to exercise his own independent discretion as to parties with whom he will deal." *Id.; United States v. Colgate & Co., supra.*

Accordingly, it is ORDERED that defendant Merck's motion for a directed verdict be, and the same hereby is, sustained. It is further ORDERED that this case be, and the same hereby is, dismissed.

Order Accordingly.

---

4. There was evidence tending to show the reasonableness and business justification of Merck's termination of plaintiff. See, e. g., Ex. 11, 19, 20. Merck would also have been justified in concluding that plaintiff's new sales program involving the elimination of salespeople in the field was undesirable in the animal

husbandry pharmaceutical industry where technical assistance to potential buyers might be so important. Of course, we do not rely on this evidence in reaching our conclusion. We only mention it to emphasize the distinctions between this case and *Girardi, supra.*