CHISHOLM BROTHERS FARM EQUIP-
MENT CO., Plaintiff-Appellant,

v.

INTERNATIONAL HARVESTER COM-
PANY, Defendant-Appellee.

No. 71–3012.

United States Court of Appeals,
Ninth Circuit.

May 17, 1974.

Rehearing Denied July 9, 1974.

Joseph M. Alioto (argued), Maxwell M. Blecher, Peter J. Donnici, Joseph L. Alioto, Brian O'Dea, Lawrence E. Alioto, San Francisco, Cal., Howard D. Humphrey, of Cosho & Humphrey, Boise, Idaho, for plaintiff-appellant.

Noble K. Gregory (argued), John A. Sutro, Allan N. Littman, Dennis K. Bromley, of Pillsbury, Madison & Sutro, San Francisco, Cal., Willis C. Moffatt, of Moffatt, Thomas, Barrett & Blanton, Boise, Idaho, for defendant-appellee.

Before ELY, TRASK and WALLACE, Circuit Judges.

TRASK, Circuit Judge:

Chisholm Brothers Farm Equipment Co. (Chisholm) appeals the District Court's directed verdict in favor of International Harvester Co. (Harvester). Jurisdiction in the trial court for this civil antitrust action for treble damages was predicated upon Section 4 of the Clayton Act, 15 U.S.C. § 15. Appellate jurisdiction lies pursuant to 28 U.S.C. § 1291. We agree with the District Court that Chisholm presented insufficient evidence to submit to a jury in support of its claims of violations under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and affirm the judgment below.

Until the business was sold in 1968, appellant was an independent dealer, located in Cassia County, Idaho, engaged in selling and servicing trucks and farm equipment manufactured by appellee. Chisholm had operated as a franchisee of Harvester since 1940, and, in 1944, had opened a second dealership in Minidoka County, Idaho.[1] This second dealership was subsequently sold to one Cameron who, in turn, eventually entered into an arrangement with Harvester that converted his business into a "co-dealership." Under this arrangement, 75 percent of the stock of Cameron Sales, Inc., (Cameron Sales) was owned by Harvester, while Cameron received 25 percent of the stock. The stock controlled by Harvester constituted all of the voting stock of Cameron Sales.

---

1. The two franchises were approximately 8 miles apart.

Cameron served as president of the corporation and, with several employees of Harvester, was a member of its board of directors. The board established policy. As the executive officer, Cameron hired and fired and set the sale prices for specific items.

Chisholm alleges that, beginning in 1961, representatives of Harvester instituted a series of practices designed to coerce Chisholm to lower its retail prices and, thereby, increase profits for Harvester at the wholesale level through a larger volume of sales. Appellant maintains that upon its refusal to comply, Harvester conspired with its subsidiary, Cameron Sales, and used its control of the latter to fix its prices at a level below that charged by Chisholm, with a resultant loss of business by appellant. Appellant contends, further, that a third participant in this conspiracy was Smith Brothers Implement Co. (Smith Brothers), another independent dealer selling and servicing Harvester's farm equipment in Cassia County, Idaho. Chisholm alleges that Harvester allowed Smith Brothers to operate at an overhead lower than that incurred by appellant, and that Smith Brothers was permitted to maintain, in violation of its franchise agreement, inadequate service facilities. Harvester is also said to have "oversold" Smith Brothers so as to cause that dealership to reduce sharply its re-

tail prices in order to move its inventory.

In 1968, the Chisholm dealership, by then a losing enterprise, was sold to GEM International (GEM), a corporation owned by two individuals[2] and Harvester in accordance with appellee's co-dealership program. Shortly thereafter, appellant filed this suit against Harvester, and charged appellee with vertical price fixing (resale price maintenance), conspiracy to monopolize, and attempt to monopolize—violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[3] After the presentation of Chisholm's case-in-chief, the District Court concluded that Chisholm's evidence was insufficient to support any reasonable inferences of liability under the antitrust laws, and granted Harvester's motion for a directed verdict.[4]

██ As appellant reminds us, the Supreme Court has admonished that summary procedures, including directed verdicts, should be used "sparingly in complex antitrust litigation where motive and intent play leading roles . . . ." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); accord, Cornwell Quality Tools Co. v. C. T. S. Co., 446 F.d 825, 832 (9th Cir. 1971), cert. denied, 404 U.S. 1049, 92 S. Ct. 715, 30 L.Ed.2d 740 (1972). Nevertheless, if an antitrust plaintiff, as well

2. Both were former employees of Harvester and one, Calvin Johnson, had been zone manager responsible for the territory containing the Harvester dealerships involved in this suit.

3. In its briefs filed in this appeal, appellant argues, albeit weakly, that appellee has also violated Section 2 of the Sherman Act by monopolization of the relevant product and geographic markets. This theory of liability was included neither within appellant's amended complaint, C.T. at 3–10, nor within pretrial memoranda filed by appellant's counsel. C.T. at 19–47, 474–89. We therefore decline to consider this theory of appellant's action as properly before this court. E. g., Roberson v. United States, 382 F.2d 714, 718 (9th Cir. 1967); Fanchon & Marco, Inc. v. Paramount Pictures, Inc., 215 F. 2d 167, 170 (9th Cir. 1954).

4. In issuing his ruling from the bench, the trial judge stated:
"I am . . . aware of the tremendous difficulty of proving a case on the plaintiff's side and of their right to have reasonable inferences and the case must hang on those ultimate inferences. But the trouble I am having in examining the evidence here is that I find the problem is that most of these inferences are based on an inference to the point mostly it is innuendo or speculation, and I just don't believe that the plaintiff has been able to produce a case here based on the violation of antitrust laws that I can properly submit to the jury, and I don't believe reasonable minds could believe that a factual situation has been presented to permit this matter to go to the jury." R.T. at 1522–23.

as any other plaintiff, does not present enough evidence within his case-in-chief to support a reasonable finding in his favor, a district court has a duty to direct a verdict in favor of the opposing party. Brady v. Southern Ry., 320 U.S. 476, 479–480, 64 S.Ct. 232, 88 L.Ed. 239 (1943); Washington v. United States, 214 F.2d 33, 41 (9th Cir.), cert. denied, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954). When considering the propriety of the grant or denial of a motion for directed verdict, the correct standard [5] is whether or not, viewing the evidence as a whole, there is substantial evidence present that could support a finding, by reasonable jurors, for the nonmoving party. Butte Copper & Zinc Co. v. Amerman, 157 F.2d 457, 458 (9th Cir. 1946). "Substantial evidence is more than a mere scintilla." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); Butte Copper & Zinc Co., *supra.* The evidence must be examined in a light most favorable to the nonmovant, Continental Ore v. Union Carbide & Carbon Corp., 370 U.S. 690, 696 & n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), and there can be no weighing of evidence. Tennant v. Peoria & Pekin Union Ry., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944). Finally, appellant here is entitled to the benefit of all *reasonable* inferences that may be drawn from its evidence. Standard Oil Co. v. Moore, 251 F.2d 188, 198 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958).

With these considerations in mind, we now review the sufficiency of appellant's case.

*Violations of Section 1 of the Sherman Act*

Relying heavily upon Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), appellant contends that Harvester engaged in resale price maintenance by combining with Cameron Sales and Smith Brothers in an attempt to force Chisholm to lower its retail prices. The argument fails for two reasons. Unlike in *Albrecht* the evidence does not establish a desire or effort by Harvester to fix the prices to be charged by Chisholm. Nor does the interplay between appellee and its dealers Smith Brothers and Cameron Sales amount to concerted action designed to force compliance by Chisholm.[6]

To support its contention that Harvester had coerced Chisholm to lower its prices, appellant introduced three reports written by a Harvester representative, zone manager Calvin Johnson, which reflected Johnson's opinion that Chisholm's business difficulties were caused, in part, by appellant's failure to price competitively in a buyer's market. The reports were written in 1962, 1966, and 1967, and were solely internal documents directed toward Johnson's superiors; they were from Johnson to Harvester and not to Chisholm. Johnson recommended termination of the Chisholm franchise, as appellant was "not willing to sacrifice profits to move

---

5. The test is identical to that which is applied when examining the appropriateness of a judgment n. o. v. Cockrum v. Whitney, 479 F.2d 84, 85 (9th Cir. 1973); Standard Accident Ins. Co. v. Winget, 197 F.2d 97, 100 (9th Cir. 1952).

6. Since Section 1 of the Sherman Act requires proof of an agreement or combination before liability may attach, appellant's prima facie case under this section must contain sufficient evidence of both attempted coercion *and* concerted action intended to force Chisholm's compliance. Of course, had appellant acquiesced in Harvester's pricing demands—which is not asserted here—the req-

uisite plurality of conduct would be present. Albrecht v. Herald Co., 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); United States v. Parke, Davis & Co., 362 U.S. 29, 46–47, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Thus, even if one assumes that there is substantial evidence of an attempt by Harvester to induce Chisholm to lower its retail prices, there can be no liability under Section 1 of the Sherman Act unless there is also sufficient evidence that Harvester engaged either Cameron Sales or Smith Brothers to assist it to achieve this result. Parke, Davis & Co., *supra* at 44; United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

goods" and was not interested in selling except "at or near list price." Appellant also exhibited documentary evidence indicating an interest, by Johnson's superiors, to discuss "seriously" his termination suggestions. Moreover, appellant demonstrated that the Chisholm brothers, after indicating a receptivity to suggestions by Harvester, had been told by Harvester representatives that their problems were caused by a failure to move their inventory and their insistence upon refusing to sell whenever a profit would not be realized. Yet the Chisholm brothers also were advised of several other alternatives that might possibly have improved their financial condition. Thus, Harvester recommended a reduction in excessive expenses, a reduction in excessive used merchandise received in "barter" or trade-in transactions, and even the assumption of a more optimistic and aggressive attitude. The Chisholm brothers themselves testified that they were not told at what prices they were to sell Harvester's products; at best, Harvester representatives only advised them of a need to "meet competition."[7]

This evidence pales in comparison with the proof deemed sufficient to establish coercion in the classic resale price maintenance cases. Thus, for example, in Albrecht v. Herald Co., 390 U. S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), the dealer, upon raising his prices above that suggested by the Herald Co., was informed by the latter that the newspaper company was entering into direct competition with Albrecht, its dealer. Moreover, Albrecht was threatened with termination if he continued to overcharge, and was told that he could have his customers back only if he charged the suggested price. 390 U. S. at 147–148. Similarly, in this court's decision in Girardi v. Gates Rubber Co. Sales Division, Inc., 325 F.2d 196 (9th Cir. 1963), there was testimony that the recalcitrant dealer had been expressly threatened with cancellation by a representative of the manufacturer after he had begun to deviate from Gate's suggested resale prices. 325 F.2d at 198. The dealer was cancelled, and, further, there was evidence that the manufacturer pursued a systematic policy of refusing to deal with distributors who did not comply with its suggested price schedule. *Id.* at 202. Here, appellant's evidence does not directly prove or give rise to reasonable inferences that Harvester even suggested specific prices to be charged by Chisholm,[8] let alone threatened to cancel Chisholm's franchise for failure to comply.

■ Appellant presented no direct evidence to support its allegation that the Cameron Sales co-dealership was established and operated to force Chisholm to increase its sales volume or, alternatively, terminate its franchise. While we recognize the import of circumstantial evidence in antitrust litigation, Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540–541, 74 S.Ct. 257, 98 L.Ed. 273 (1954); Interstate Circuit, Inc. v. United States, 306 U.S. 208, 221–227, 59 S.Ct. 467, 83 L.Ed. 610 (1939), once again reference

---

7. R.T. at 769, 798–99, 971.
   Donald Chisholm testified as follows:
   "Q. Yesterday you mentioned that International Harvester gives you a suggested list price; do you recall that?
   "A. Yes, sir.
   "Q. And you also testified that you had to have some kind of suggested price; do you remember that?
   "A. Yes, sir.
   "Q. And that you found this suggestion of Harvester's useful?
   "A. The industry does, yes.
   "Q. And Harvester never told you you had to charge that price, did they?

   "A. No.
   "Q. You were left to charge whatever price you felt like charging; isn't that correct?
   "A. That is correct.
   "Q. But you decided of your own free will that you would try to charge the suggested price; isn't that correct?
   "A. That is right." R.T. at 768–69.

8. Harvester did provide suggested retail prices for its products, but Chisholm alleges that it was pressured to sell at prices *below* those suggested. Chisholm was, in fact, selling "at or near" the listed prices.

and comparison to the much-cited resale price maintenance cases demonstrates the weakness of appellant's assertions. For example, in FTC v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922), the manufacturer enforced its price maintenance scheme by refusing to deal not only with jobbers, retailers, and wholesalers who failed to abide by Beech-Nut's suggested prices, but also with other distributors who sold to such noncomplying jobbers, retailers, and wholesalers. Resumption of business was possible only upon assurances that the distributor would maintain Beech-Nut's suggested prices and refuse to deal with any distributors who did not. Moreover, "price-cutters" were reported to Beech-Nut by other distributors of its products, and other jobbers, retailers, and wholesalers were notified by Beech-Nut precisely which individuals were deviating from the company's price schedules so that these individuals might be boycotted pursuant to the "Beech-Nut Policy." 257 U.S. at 446–451.[9]

We have nothing of that sort in the case before us. Appellant makes much of the undisputed evidence that Harvester expressed interest in Cameron Sales's large inventory of overaged new and used goods and items received in "barter" transactions. Cameron was told by Harvester representatives that he should move this inventory; indeed, he was told that the barter items should be disposed of "regardless of price." Yet the evidence does not support a reasonable inference that parent-Harvester's interplay with its subsidiary Cameron Sales was designed to implement, as in *Beech-Nut* and its progeny, a pervasive scheme of resale price maintenance. It was simply giving business management and direction to a corporation in which it had a 75 percent stock ownership. There is no substantial evidence allowing a conclusion that Cameron Sales was operated to trigger lower prices by Chisholm.

■ We are also unable to agree with appellant that the concerted action between Harvester and Cameron Sales [10] constituted an agreement to fix the resale prices to be charged by the latter. The crux of any price-fixing agreement is the relinquishment by a trader (here, Cameron) of the freedom to set prices in accordance with his own judgment. *See* Gray v. Shell Oil Co., 469 F.2d 742, 747–748 (9th Cir. 1972), cert. denied, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973); Plymouth Dealers' Ass'n v. United States, 279 F.2d 128, 132 (9th Cir. 1960), quoting Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Checker Motors Corp. v. Chrysler Corp., 283 F.Supp. 876, 882–883 (S.D.N.Y.1968), aff'd, 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). There was abundant testimony below that Cameron, as president of Cameron Sales, retained the authority to price the items

---

9. The *Beech-Nut* scenario is fairly typical of the many cases in which liability for vertical price fixing has been found. *See, e. g.,* United States v. Parke, Davis & Co., 362 U.S. 29, 33, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) (compliance obtained by refusing to deal with maverick retailers *and* with wholesalers who dealt with such retailers). In Albrecht v. Herald Co., 390 U.S. 145, 88 S. Ct. 869, 19 L.Ed.2d 998 (1968), the carrier who raised his price beyond the level suggested by the newspaper was confronted by a combination of the newspaper and two additional parties who—with knowledge that the activities were designed to force compliance by Albrecht—joined with the newspaper in directly competing for Albrecht's cus-

tomers. 390 U.S. at 147–150. In our decision in Girardi v. Gates Rubber Co. Sales Division, Inc., 325 F.2d 196 (9th Cir. 1963), the concerted action intended to force compliance was jobbers' complaints to the manufacturer in which they reported variation by another from the manufacturer's suggested retail prices. 325 F.2d at 200–204.

10. It is clear that the interaction between Harvester and Cameron Sales satisfied the "agreement" requirement of section 1. *See, e. g.,* Kiefer Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 215, 71 S. Ct. 259, 95 L.Ed 219 (1951). The issue thus becomes whether or not this agreement resulted in an unreasonable restraint of trade.

to be sold by the corporation.[11] Harvester's suggestion—even "pressure"—that Cameron set prices for his inventory of new and used overaged goods that would facilitate the depletion of this inventory never amounted to a specification of what prices were to be charged by Cameron. To be sure, appellant elicited testimony demonstrating that Cameron was advised, or "pressured," to move this inventory "regardless of price." Nonetheless, the bulk of the testimony, and in particular that of Cameron himself, does not permit one reasonably to infer that these expressions by Harvester representatives impinged Cameron's independent pricing discretion.[12]

■■ Our analysis may not be terminated, however, by concluding that the interplay between Harvester and Cameron Sales did not constitute vertical price fixing, which is per se unreasonable under Section 1 of the Sherman Act. We must also examine the evidence and inquire whether appellant presented a sufficient case for liability when the acts in question are scrutinized pursuant to a rule-of-reason test.[13]

Under this approach, it is necessary to consider the purpose of the practices, the power of Harvester in the relevant product and geographic markets, and the effect of the practices upon competition within these markets. Times-Picayune Publishing Co. v. United States, 345 U. S. 594, 615, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); see Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S. Ct. 242, 62 L.Ed. 683 (1918) (Brandeis, J.). With the evidence presented below, we need look at only the first of these requirements: Harvester, as a parent corporation, was entitled to ensure that Cameron Sales's inventory was sufficiently fluid so as to avoid excessive interest charges incurred by reason of retention of overaged products.[14] Moreover, Harvester's concern for the movement of overaged goods and Cameron's barter inventory, both of which involved significant capital and were subject to loss attributable to depreciation, is supported by sound business judgment.[15] We perceive no substantial evidence upon which to predicate an inference that Harvester acted in furtherance of anticompetitive objectives. *See generally* United States v. Columbia Steel Co., 334

11. R.T. at 448–50, 502–03, 1042, 1080, 1097–98, 1114, 1439–42. As appellant argues, the board of directors of Cameron Sales, consisting of Cameron and several Harvester employees, possessed the authority to remove the corporation's president should the business be conducted unprofitably. This is not the equivalent, however, of an ability to dictate to the president the specific prices to be charged by the dealership.

12. When questioned about the statement of Harvester's representative that his overaged goods and barter should be moved "regardless of price," Cameron responded:

"That's what he says, but after all, he didn't have any money invested in this business and I did. I suspect that I am going to be a little bit careful how I am going to treat those prices." R.T. at 448.

13. The term "rule of reason" was introduced by Chief Justice White in Standard Oil Co. v. United States, 221 U.S. 1, 62, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Since that time, the rule has been employed to determine whether agreements among entrepreneurs violate Section 1 of the Sherman Act as combinations "in restraint of trade." *E. g.*,

United States v. Topco Associates, Inc., 405 U.S. 596, 606–607, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). *See* A. D. Neale, The Antitrust Laws of the U.S.A. 20–27 (2d ed. 1970); 1 J. von Kalinowski, Antitrust Laws and Trade Regulation § 6.02 [1] (1971). The rule is not applied to those agreements, such as agreements to fix prices, that, because of their inherent "pernicious" effect upon competition, are regarded as unreasonable per se. Topco, *supra* at 607; Northern Pacific R. Co. v. United States, 356 U.S. 1, 5, 78 S. Ct. 514, 2 L.Ed.2d 545 (1958).

14. Harvester allows its dealers to hold new equipment for sale without payment or interest for 9 or 12 months depending upon the type of equipment involved. At the expiration of this period, interest at the market rate on the equipment still on hand must be paid. R.T. at 1168–69.

15. In addition to the prevention of interest and depreciation expenses and the desire to release needed capital, the movement of inventory was designed to permit Cameron Sales to qualify for Harvester's volume discount.

U.S. 495, 522–523, 68 S.Ct. 1107, 92 L. Ed. 1533 (1948); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76–80 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 663, 665 (9th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).

In support of its contention to the contrary, and also in support of its allegation that Harvester violated Section 2 of the Sherman Act by attempting and conspiring to monopolize, appellant points to a meeting of several Harvester dealers, held after Chisholm had terminated its franchise, at which a fixed price for a certain item was agreed upon. Appellant cites several cases for the proposition that such a subsequent event is relevant circumstantial evidence to establish the presence of anticompetitive conduct occurring within the prior period, i. e., the period before appellant sold its franchise. E. g., FTC v. Cement Institute, 333 U.S. 683, 703–706, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). We do not dispute this rule of evidence. See Girardi v. Gates Rubber Co. Sales Division, Inc., 325 F.2d 196, 203 (9th Cir. 1963). When this evidence is viewed in conjunction with the totality of the testimony presented below, however, the probative value of this single meeting is significantly diminished. Any inference that Harvester intended to fix prices during the prior period is rebutted by evidence establishing legitimate business purposes for its actions during that period. In other words, evidence of this single price-fixing meeting, although favorable to appellant, did not contribute to substantial evidence sufficient to withstand

a directed verdict in favor of appellee.[16] *Compare Girardi, supra.*

■ There is no evidence to support appellant's assertion that Smith Brothers conspired with Harvester to coerce Chisholm to lower its prices or, alternatively, retire from the market. Thurlow Smith, the active partner, testified that Harvester never forced him to accept merchandise he did not desire; if his dealership was overstocked, such was regarded by him only as a regular incident of this particular business enterprise.[17] The evidence indicates that Harvester, rather than tolerating inadequate service facilities at Smith Brothers, sought to improve the dealership's "parts" department. More importantly, however, the differential in overhead between Chisholm and Smith Brothers is assignable to the former's stress upon service over sales for the derivation of profit and, further, to a difference in scope between the two businesses.[18]

*Violations of Section 2 of the Sherman Act*

■ Appellant's prima facie case to establish liability for attempt and conspiracy to monopolize required proof that Harvester possessed a specific intent to acquire unlawful monopoly power. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); Lessig v. Tidewater Oil Co., 327 F.2d 459, 474–475 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). We have only recently reaffirmed previous decisions of this court holding that this specific intent "must be accompanied by predatory conduct directed to accom-

---

16. Similarly, the statement by Cameron, after Chisholm had terminated its relation with Harvester, that he hoped Chisholm's replacement would engage in interbrand, rather than intrabrand, competition, although relevant, lacks sufficient probative value to allow an imputation of anticompetitive intent to Harvester during the prior period.

17. R.T. at 564–72.

18. For example, Smith Brothers, unlike Chisholm, carried only · International's farm equipment, not its trucks. It operates out of a service station. John Chisholm testified that his dealership relied upon its parts and service department, and Harvester's volume discount, to recoup losses incurred on sales of Harvester's trucks. See R.T. at 873, 924.

plishing the unlawful purpose." Hallmark Industry v. Reynolds Metal Co., 489 F.2d 8, 12 (9th Cir. 1973). Generally, it is from this predatory conduct that the requisite specific intent can be inferred. *Id.* We have examined carefully the evidence depicting Harvester's operations in Cassia and Minidoka Counties during the critical time period at issue. We agree with the District Court that the evidence did not disclose that Harvester's actions were not predominately motivated by legitimate business objectives. Accordingly, appellant's case under Section 2 of the Sherman Act must fail. *See* Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626–627, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 667–668 (9th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).

Harvester did not manage its subsidiary Cameron Sales without regard to retail profit. Indeed, the continued solvency of Cameron Sales underlay Harvester's attempts to have the corporation reduce its inventory of overaged goods and items received through barter transactions. Prolonged maintenance of such an inventory would, according to the testimony adduced below, result in a substantial restriction of invested capital and would necessitate interest payments and other avoidable business expenses.[19] The record shows that Cameron Sales operated profitably for the majority of the years in question.[20] With these facts, appellant's reliance upon Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453 (W.D.Pa.1968), aff'd on other grounds, 417 F.2d 622 (3d Cir. 1969), is misplaced.[21] *Cf.* England v. Chrysler Corp., 493 F.2d 269, 273–275 (9th Cir. 1974).

In conclusion, we have reviewed appellant's case with full regard for our duty to examine the evidence as a whole. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698–699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). The District Court correctly granted appellee's motion for a directed verdict.

The judgment is affirmed.

19. *See* notes 14–15 *supra.*

20. Net profit was demonstrated for fiscal year 1964 and fiscal years 1966–1970. R.T. at 509–11. Cameron purchased Harvester's interest in Cameron Sales in 1971 and, thereby, terminated the co-dealership arrangement.

21. In *Mt. Lebanon Motors, supra,* plaintiff, a former independent Chrysler automobile dealer, sued Chrysler Corp. and alleged that Chrysler was using its wholly owned and substantially owned dealerships in an attempt to obtain monopoly power. The court summarized plaintiff's evidence, which was held sufficient to withstand a motion for a directed verdict, as follows:

"Plaintiff offered evidence tending to show that the Chrysler-financed dealerships, commonly called 'factory stores', engaged in price-cutting and massive advertising, to the detriment of privately-financed dealerships in the Pittsburgh area, which were not able to afford advertising on such a large scale or to accept profits as small as those obtained by the factory stores in their deals with customers.

"Plaintiff's proof tended to show that the factory stores consistently lost money and were unprofitable; but that from time to time, when circumstances required, Chrysler would make gifts or additional investments in the form of 'capital contributions' to the factory-financed dealerships, thus enabling them to continue in business, notwithstanding their losses resulting from their normal operations.

"There was also evidence that the 'dealer enterprise' division of Chrysler would from time to time furnish temporary employees to the factory stores when they experienced a shortage of adequate personnel and would furnish assistance to the factory stores in establishing their accounting systems and would also furnish substantial advertising allowances in launching the new dealerships." 283 F. Supp. at 457.