**REED BROTHERS, INC., Appellant,**

v.

**MONSANTO COMPANY, Appellee.**

#### No. 74–1695.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1975.

Decided May 22, 1975.

Rehearing and Rehearing En Banc Denied July 16, 1975.

Certiorari Denied Jan. 12, 1976. See 96 S.Ct. 787.

---

Brent B. Green, Des Moines, Iowa, for appellant.

Fred H. Bartlit, Jr., Chicago, Ill., for appellee.

Before CLARK, Associate Justice,* and LAY and BRIGHT, Circuit Judges.

Mr. Justice CLARK.

Appellant, Reed Brothers, Inc. (Reed), is a wholesaler of agricultural products located in Winterset, Iowa. On July 31, 1972, it brought this action for damages in the Southern District of Iowa pursuant to 15 U.S.C. § 15, claiming that Monsanto Company—a manufacturer of various products, including agricultural herbicides, based in St. Louis, Missouri, had violated the Sherman Act by engaging in unlawful territorial and customer restraints. On May 24, 1974, a jury verdict of $59,990.04 was returned in favor of Reed, but on August 9, 1974, upon motion of Monsanto, the district court entered judgment notwithstanding the verdict or, in the alternative, for a new trial, principally on the grounds of insufficient evidence. We reverse.

*Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

## I.

In 1962, Reed became a "contract distributor" of Monsanto's pre-emergent corn and soybean herbicides known as Lasso and Ramrod, which entitled it to buy directly from Monsanto at distributor prices. In the years 1966 and 1967, Reed was assigned a seven-county "area of primary responsibility" in Iowa pursuant to the provisions of Monsanto's standard form contract which stated:

> While nothing in this Agreement shall restrict the territory within which Distributor shall be free to distribute the Goods, Distributor's area of primary responsibility for distribution of each of the Goods or groups of Goods shall be as defined in Exhibit A.

> \* \* \*

> Distributor shall exert its best efforts to exploit fully the potential markets for the Goods in the assigned areas.

Though it operated two retail outlets in Iowa for direct sales to farmers, most of Reed's sales were to dealers rather than users and almost exclusively outside of its "area of primary responsibility." For example, during crop year 1968—its last year as a contract distributor—Reed ordered a total of 750,000 pounds of Ramrod, but sold less than 3,000 pounds of it to dealers within the seven-county area. At trial, it was estimated by Monsanto that the potential market for herbicides in Reed's seven-county assigned area was some 6 million pounds. Some 15 distributors had "areas of primary responsibility" which overlapped Reed's, but appellant was one of only two distributors headquartered in that area of Iowa. Nevertheless, in 1968, Reed sold a mere $1,458 worth of herbicides to four out of the 25 dealers located in that area.

In the fall of 1968, at the expiration of Reed's last annual distributorship contract, Monsanto declined to renew the contract, thus terminating Reed as a distributor. Though it does not appear that a written explanation of Reed's termination was provided at that time, Monsanto later answered one of Reed's pre-trial interrogatories as follows:

> The reason for not renewing plaintiff's distributor contract with Monsanto was plaintiff's inherent and demonstrated inability or refusal to organize and operate the distributorship in a manner which would enable it to adequately and properly develop and maintain the dealer market potential in its area of responsibility.

A year earlier, in September of 1967, Monsanto had sent letters to all distributors, informing them that it would use six criteria to evaluate them for future renewals. Specifically Reed was told that its 1968 sales performance would be measured against the following standard:

> 6. Can the Distributor be expected to exploit fully the potential markets for the Goods in the Distributor's area of primary responsibility?

Significantly, Fred Reed, Jr., who manages the herbicide business for appellant, made the following admission at trial on direct examination:

> Q. So that, Mr. Reed, reviewing those six criteria that Monsanto Company sent out to you when they gave you that contract, based upon what you have now testified to, which criteria, if any, did you not fulfill?

> A. I would say No. 6.

From this record, it seems clear that Reed was terminated solely because of Monsanto's justifiable dissatisfaction with Reed's sales performance within the seven-county area. There is no evidence to suggest that Monsanto took action against Reed for its extra-territorial sales. Although Fred Reed, Jr., estimated at trial that appellant had lost some $347,500 in net profits for the period 1969 to 1973 due to the loss of its distributorship, it cannot be said that this is an injury which results from Monsanto's efforts to enforce territorial restrictions. A different situation, however, exists in regard to the post-termination period.

Following its termination in 1968, Reed continued to sell Monsanto products to dealers throughout the Midwest, but was by necessity forced to turn to other distributors for its source of sup-

ply. Beginning in 1969, Reed took to operating as a "discounter" or wholesaler, buying from distributors at a high-volume discount and selling to retailers or other wholesalers over the telephone with little overhead expense, working with low margins of profit, between two and four percent. In the 1969, 1970, and 1971 crop years, Reed purchased large quantities of Monsanto herbicides from various Monsanto distributors: John Mulvihill of Bird Island, Minnesota; Dick Chadima of Cedar Rapids, Iowa; Laverty Sprayers Co. of Indianola, Iowa; and John Anderson of Fremont, Nebraska. In 1971, for example, Reed purchased some $1.1 millions worth of Monsanto products from Anderson, and Reed's total 1971 Monsanto sales amounted to $1.25 million. Two policy decisions by Monsanto, however, conjoined to profoundly affect Reed's future business.

In 1969, Monsanto implemented a new shipping and pick-up policy which provided that: (1) orders for shipment of herbicides would thereafter be accepted for prepaid delivery only for destinations within the ordering distributor's "area of primary responsibility," and (2) orders for pick-up of herbicides would thereafter be accepted only at Monsanto warehouses within the ordering distributor's assigned territory. The obvious effect of this change in Monsanto's prior policies was to increase the distributor's transportation costs for sales outside his assigned territory, thus making it financially unattractive for the distributor to make such sales.

Additionally Monsanto put into operation in 1972 a voluntary compliance system, denominated the "Dealer Compensation Program," under which rebates were paid to distributors on a per unit basis for all Monsanto herbicides sold directly from contract distributor to retail dealer.[1] Cooperating distributors received no rebates for sales to wholesalers, such as Reed, even though the latter's sales were directly to dealers. The rebates varied in rate from product to product and were paid for the distributor's participation in certain "activities." In its brief, Monsanto stated that the purpose of the program was "to help cover the higher costs incurred by distributors who employ the extra salesmen needed to aggressively penetrate the dealer markets." Its direct effect was simply to eliminate wholesalers and discounters. A chart, showing the various activities and the rates for two of Monsanto's herbicide products, follows:

DISTRIBUTOR ACTIVITY

| | Ramrod–20 | Lasso |
|---|---|---|
| Reporting back to Monsanto total sales of Monsanto herbicides to each retail and non-retail customer | $.002/lb. | $.075/gal. |
| "Stocking retailer's store shelves," i. e., selling and delivering to dealers, early in the year | $.003/lb. | $.12/gal. |
| TOTAL | $.005/lb. | $.195/gal. |
| Price to Distributor | $.405/lb. | $11.00/gal. |
| Suggested Resale Price | $.44/lb. | $12.00/gal. |

1. A retailer was defined by Monsanto as one who sold 90 percent of its purchased agricultural chemicals directly to the ultimate consumer.

Following the institution of Monsanto's Dealer Compensation Program, the matter stood as follows: the 1969 shipping policy change made it economically impossible for distributors to sell to anyone outside their assigned territories because of transportation costs, and the 1972 rebate program made it economically unattractive for them to sell to wholesalers because of the price differential. Caught in the crossfire of these two policies, Reed found itself unable to purchase Monsanto products from its usual sources. In particular, Reed could no longer buy from John Anderson of Fremont, Nebraska—who had previously sold more than a million dollars worth of Monsanto herbicides to appellant in 1971. In 1972, the assigned territory of Anderson was changed so that it no longer included Reed's portion of Iowa. According to Fred Reed, Jr.,'s testimony, Phil James, Anderson's vice-president, told him that Anderson was unable to sell to Reed, first, because it would get no rebate and, second, because Reed was no longer within Anderson's "area of primary responsibility."

Other distributors who had sold to Reed in the past also refused to sell to it in 1972 and 1973. Earlier, in crop year 1971, for example, John Mulvihill of Bird Island, Minnesota, had told Fred Reed that Iowa had been taken out of Mulvihill's territory and that he could no longer sell to Reed as he had done in the past. Mulvihill testified at trial that in 1969 a Monsanto representative, Robert Schweikher, told him:

> No, this is what we mean by area of responsibility. You will not make any sales outside of those states that are listed on your contract. And in order to support that or enforce it, we will not allow you to pick up from any of our warehouses that are not within the states outlined in your contract, nor on the other hand will we make delivery to you to any point if that point does not lie within the states on your contract.

Mulvihill was also warned about a sale he had made to be delivered outside his territory and was told not to engage in that type of activity any more. He testified that, as the crop year 1973 approached, he felt that Monsanto was easing up on its territorial restraints and that he would therefore be able to sell to Reed once again. But when he contacted Reed, and arrangements for the sale of 8,500 gallons of Lasso were concluded, he spoke to a Monsanto representative, Dan Sikes, to inquire about where he could sell and where Reed could pick up the products; Mulvihill was told that he could not sell outside his area because Monsanto's policy had not changed. Consequently, the sale went unconsummated. In addition, Mulvihill testified to other instances in which Monsanto either tried to enforce its territorial restrictions or did prevent Mulvihill from making sales outside his assigned area.

Another distributor, Leo Sterk of Laverty Sprayers in Indianola, Iowa, testified that he had to raise his prices to Reed because of appellant's wholesaling activities. Sterk had sold a large quantity of Monsanto herbicides to Reed in 1972 and applied for the dealer rebate based on Reed's selling the products directly to growers. Monsanto, however, disallowed much of the rebate claim on the grounds that Reed had wholesaled at least one-half of its purchases from Laverty Sprayers. Thereafter, in determining his sales price to Reed, Sterk took into account whether he would receive a rebate on the sale. Consequently, Reed had to pay a higher price for the herbicides than it otherwise would have to pay.

As to the dealers, there was testimony from one of Reed's dealer customers, J. D. Fleener, that when Monsanto's rebate system went into effect he could no longer trade with Reed because he was able to purchase Monsanto products from distributors at a lower cost than Reed himself could; e. g., Lasso herbicide for 5 cents a gallon cheaper than Reed could purchase it.

In addition, United Suppliers of Eldorado, Iowa, a co-op wholesaler owned by some 150 farm supply retailers, was shown to have encountered problems

similar to Reed's in its dealings with Monsanto. Since United Suppliers purchases from distributors and resells herbicides to retailers, Monsanto distributors did not receive rebates in connection with sales to United. Mrs. Janice Kramer, a United Suppliers employee, testified that Monsanto distributors had told her that if it were not for the rebate system, they would be able to sell Monsanto products to United at a lower price. When asked at trial why she no longer purchased Monsanto products from Reed Brothers, she replied, "because I felt I have to buy from a direct distributor, because Mr. Reed was in the same position that I was."

The impact of Monsanto's Dealer Compensation Program, when combined with the earlier shipping policy change, was dramatic. While in 1971 Reed had been able to purchase and sell more than one and a quarter million dollars worth of Monsanto products, its sales dropped to half a million dollars in 1972. A chart showing Reed's sales and profits for the years 1968 to 1973 follows:

## REED SALES

| Year Ending | Monsanto Sales | Total Sales | Net Profit | Percent Profit |
|---|---|---|---|---|
| 8/31/68 | $ 518,371.03 | $1,945,547.98 | $45,615.89 | 2.3% |
| 8/31/69 | 606,022.08 | 1,481,606.91 | 32,764.93 | 2.2 |
| 8/31/70 | 431,610.77 | 1,242,469.34 | 68,524.33 | 5.5 |
| 8/31/71 | 1,258,778.58 | 2,583,272.82 | 78,181.39 | 3.0 |
| 8/31/72 | 544,884.75 | 2,170,211.07 | 93,021.80 | 4.3 |
| 8/31/73 | 472,921.69 | 1,716,391.79 | 6,865.42 | 0.4 |

The effect of Monsanto's policies was to price wholesalers out of the market, as the following exchange between Fred Reed, Jr., and Monsanto's counsel on cross-examination illustrates:

Q. Now, you testified this morning in response to questions from Mr. Green that over the entire period of time since your contract with Monsanto expired, you had trouble getting a supply of product and couldn't get as much as you needed. Do you recall that testimony? A. Yes.

Q. The fact is, isn't it, Mr. Reed, that for every year since then, for 1969, 1970, 1971, 1972 and 1973, you were able to obtain all of the Monsanto herbicides you wanted, isn't that a fact?

A. For what years?

Q. For every single year. A. Right now I can't—

Q. Let's take the years—I guess everybody is short now, aren't they? A. Pretty short.

Q. Right. But let's take the years 1969, 1970, 1971, 1972, 1973. For those years, you got all the Monsanto herbicides you wanted, didn't you? A. Not at the right price.

Q. Well, everybody wants to buy cheaper, but you got all the quantity of herbicides you wanted, didn't you, Mr. Reed? A. I imagine that I could have sold more if I could have gotten it at the right price.

On the basis of a 3.75% profit level—the average of the four preceding years—and of maintaining its 1971 sales level in 1972 and 1973, Reed estimatèd that it lost some $59,460 in profits.

## II.

Reed's original complaint contained three counts, two of which were voluntarily dropped prior to trial.[2] The re-

2. Reed's original complaint also alleged an attempt to monopolize in violation of Section Two of the Sherman Act, as well as unlawful resale price maintenance at arbitrary and non- competitive levels in violation of Sections 2(a), 2(c), 2(d), and 2(e) of the Robinson-Patman Act.

maining count, grounded in Section One of the Sherman Act, alleged two separate claims: (1) that Monsanto terminated Reed as a contract distributor in 1968 because of its failure to comply with an alleged agreement between Monsanto and its distributors to confine sales of Monsanto products to each distributor's "area of primary responsibility"; and (2) that Monsanto instituted its 1969 shipping policy change to enforce its territorial restrictions and its 1972 Dealer Compensation Program to limit sales to certain classes of customers, thus excluding wholesalers such as Reed.

Trial commenced on May 13, 1974. Monsanto defended principally on the ground that its actions resulted from its own independent business decisions and that there was, therefore, no agreement between the manufacturers and its distributors. On May 24, 1974, the jury returned a verdict in favor of Reed in the amount of $59,990.04, closely approximating its damage claim under its second theory of recovery, relating to Monsanto's post-termination shipping and rebate policies. The district court subsequently considered and granted Monsanto's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Its opinion on these two motions follows:

*Motion for Judgment Notwithstanding the Verdict*

The Court grants the defendant's motion for judgment notwithstanding the verdict on the following grounds:

(1) There was insufficient evidence of a contract, combination or conspiracy between Monsanto and its distributors to restrict sales of herbicides to assigned territories to submit this issue to the jury. There was also insufficient evidence to show territorial restrictions were enforced by Monsanto.

(2) There was insufficient evidence of a contract, combination or conspiracy between Monsanto and its distributors to impose post sale restraints on where and to whom Monsanto products could be sold,

(a) under its shipping policies,

or

(b) under its dealer compensation programs.

(3) Even if Monsanto and its distributors agreed to the shipping policy and dealers compensation program, these practices did not constitute a violation of the Sherman Act.

(4) The evidence as to the fact of damages and the amount of damages was so speculative and uncertain that it did not justify the submission of that issue to the jury.

The Court tendered an instruction which would have permitted the jury to consider the assignment of an area of primary responsibility, the shipping policy and the dealer compensation programs together to determine where they constituted an unreasonable restraint of trade under the rule of reason. This issue was not submitted by agreement of the parties. Plaintiff had claimed that these matters together constituted a per se violation of the Sherman Act. However, no objection was made to the failure to submit this issue as a per se violation of the Sherman Act. The Court would have submitted this issue to the jury had objection been made. In the event the Circuit Court of Appeals reverses the granting of judgment notwithstanding the verdict, and affirms the ruling on motion for new trial, guidance on the submission of this matter on new trial, would be helpful.

*Motion for New Trial*

In the event the Circuit Court of Appeals would reverse, the granting of judgment notwithstanding the verdict, the defendant's motion for new trial is granted on the following grounds:

(1) For all the grounds on which the motion for judgment notwithstanding the verdict was granted.

(2) The verdict was against the clear weight of the evidence.

(3) Issues involving Monsanto's shipping policy and distribution compensation programs, if submitted to the jury, should have been submitted under the rule of reason.

It is Therefore Ordered that defendant's motion for judgment notwithstanding the verdict is granted.

It is Further Ordered that in the event the ruling on the motion for judgment notwithstanding the verdict is reversed, the defendant's motion for new trial is granted.

### III.

From our examination of the record, we agree with Monsanto's conclusion that the jury verdict for Reed was based on Monsanto's post-termination practices rather than on Reed's first cause of action relating to its termination as a contract distributor. Had the jury found for Reed solely on the latter claim, the district court could properly have granted a judgment n. o. v. for Monsanto and we would have affirmed, for it is clear that Reed was terminated as a distributor because of its poor record within its "area of primary responsibility" rather than for its good record outside. As we noted earlier, there was no showing that Monsanto's 1968 refusal to deal with Reed was the product of any effort by the manufacturer to enforce its alleged territorial restrictions, and appellant therefore has not met the burden of § 4 of the Clayton Act, 15 U.S.C. § 15, that a party claiming damages must demonstrate that he has been injured "by reason of" something forbidden by the antitrust laws. See Reibert v. Atlantic Richfield Co., 471 F.2d 727, 731 (10th Cir. 1973); Duff v. Kansas City Star Company, 299 F.2d 320 (8th Cir. 1962). A manufacturer may certainly choose the customers to whom it wishes to sell so long as its conduct has no monopolistic or market control purpose, Colorado Pump & Supply Co. v. Febco, Inc., 472 F.2d 637, 640 (10th Cir. 1973); furthermore, a manufacturer may properly designate geographic areas in which distributors shall be primarily responsible for distributing its products and may terminate those who do not adequately represent it or promote the sale of its products in such areas. See, e. g., United States v. Arnold, Schwinn & Co., 291 F.Supp. 567, 568 (N.D.Ill.1968) (on remand). We cannot conclude, however, that Monsanto's post-termination practices are equally devoid of anticompetitive consequences.

### IV.

We begin our review of this case, as we must, with a look at the controlling statute, Section One of the Sherman Act, which provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *.

The Supreme Court's most recent examination of this statute in the area of vertical market restraints is United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), where it is said:

[W]here a manufacturer sells products to his distributor subject to territorial restrictions upon resale, a per se violation of the Sherman Act results. And, as we have held, the same principle applies to restrictions of outlets with which the distributors may deal and to restraints upon retailers to whom the goods are sold. Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. [388 U.S. at 379, 87 S.Ct. at 1865.]

From our examination of the record, we think that the jury could well have con-

cluded that Monsanto's 1969 and 1972 policies directly effected *where* its distributors could sell and to whom they could sell, which is precisely the sort of restraint forbidden in *Schwinn.* The judgment n. o. v. must therefore be reversed, for as the Supreme Court emphasized regarding judgments n. o. v. in *Tennant v. Peoria and Pekin Union Ry.,* 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944):

> Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

## A. Agreement

■ Monsanto's first line of defense is that there was no showing of any "contract, combination * * * or conspiracy" between itself and its distributors. No formal agreement, of course, need be shown. Here, the formalities of Monsanto's legitimate "area of primary responsibility" contract formed the base upon which the illegitimate elements were laid. Despite the express language of the contract, as well as the manufacturer's public assertions, there existed a "silent combination or understanding" to restrain trade, *Schwinn, supra,* 388 U.S. at 382, 87 S.Ct. 1856, 18 L.Ed.2d 1249, which might be implied from the course of dealings between the manufacturer and its distributors, *United States v. Schrader's Sons, Inc.,* 252 U.S. 85, 99, 40 S.Ct. 251, 64 L.Ed. 471 (1920); *Frey & Son, Inc. v. Cudahy Packing Co.,* 256 U.S. 208, 210, 41 S.Ct. 451, 65 L.Ed. 892 (1921). "When the manufacturer's actions * * * go beyond mere an-

nouncement of his policy and the simple refusal to deal, and he employs other means which effect adherence to" his policies which restrain trade, he has put together a combination in violation of the Sherman Act. *United States v. Parke, Davis & Co.,* 362 U.S. 29, 44, 80 S.Ct. 503, 512, 4 L.Ed.2d 505 (1960). "If the arrangement or combination * * is put together through the coercive tactics of the seller alone, this is sufficient." *Osborn v. Sinclair Refining Company,* 324 F.2d 566, 574 n.13 (4th Cir. 1963).[3]

■ Here, like the situation in *Schwinn* and unlike that in *Colorado Pump & Supply Co., supra,* there is evidence to show that Monsanto set about "firmly and resolutely" enforcing its territorial restrictions by means of its 1969 shipping and pick-up policy change. John Mulvihill, a contract distributor for Monsanto and owner of Mid-State Chemical Company in Bird Island, Minnesota, testified to several conversations in which Monsanto officials emphasized that Mulvihill was not to sell outside its territory, that the pick-up policy was designed to support that policy, and that termination awaited the miscreant distributor who refused to adhere.[4] On October 26, 1970, Mulvihill was called to a meeting at the Thunderbird Motel in Minneapolis, Minnesota, with four Monsanto officials—Neale Sinclair (the district sales manager for Iowa), Max Albertson (the district sales manager for Minnesota), Norm Probst (district product developer for Minnesota), and Robert Schweikher (regional sales manager). There, Mulvihill was told that they were taking two states away from him, including Iowa. He testified at trial regarding this meeting:

---

**3.** *Parke, Davis,* of course, was a price-fixing case and *Osborn* was a tying arrangement case, but the principle is as well applicable to territorial restraints. *See Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894, 900 (5th Cir. 1973).

**4.** Monsanto strenuously argues that we should not take into account any of the "hearsay" testimony of Mulvihill regarding what various Monsanto officials might have said to him about sales. It asserts that this hearsay

should have been excluded because there was no independent evidence of the existence of an agreement between Monsanto and its distributors. *See A. P. Hopkins Corp. v. Studebaker Corp., Onan Division,* 496 F.2d 969, 974 (6th Cir. 1974). Here, Mulvihill is himself a coconspirator whose own testimony, along with the documentary evidence of dealer contracts and Monsanto's own admissions about its rebate program, establishes the parameters of the conspiracy.

Q. Did anybody say anything to you about sales the previous year to certain types of people in Iowa?

A. Yes, sir.

Q. And who said that to you? A. Mr. Sinclair.

Q. And what did he say? A. He said that he didn't want Mid-State making sales to people such as Van Diest at Webster City; Reed at Winterset; Sands at Marcus, Iowa; and Brokaw at Fort Dodge.

Q. And he specifically mentioned Reed at Winterset? A. Yes, sir.

Q. Now, did anybody there say anything to you about the next year selling within the territory you had left, i. e., Minnesota and South Dakota, with reference to renewal of the contract? A. Yes. I was told that if I didn't play the game the way they described it to me, and agreed to it, that I might be running the risk of losing the contract altogether.

Q. And do you recall who told you that? A. I believe that would have been Mr. Schweikher.

Q. And so did you then play the game the way that they wanted you to? A. I thought that I had at all times with them.

Mulvihill went on to testify regarding several potential sales which were directly vetoed by Monsanto or were rejected by Mulvihill because they would have been made to customers outside of his assigned territory. Among other transactions, Mulvihill told of one in which he was contacted in 1970 by a New York customer as follows:

Q. Why did he contact you at this time, what was the purpose for him contacting you? A. He wanted to buy some Randox.

Q. Randox being a Monsanto product? A. Yes.

Q. Did you ever make that sale to him? A. No, sir, I didn't.

Q. And what was the reason for that? A. Because Monsanto would not let me make that sale.

Q. And when you say not let you make that sale, what did they do or say to you with regard to the possibility of that sale? A. They reminded me that that was in an area of sales activity that I shouldn't be involved in, and they wouldn't let me pick up in their warehouse in New York, nor would they make delivery for me.

Q. Did they say anything with reference to your primary area of responsibility? A. Well, I don't remember any recollection of them using the words "primary responsibility" with me. It was always "This is a state where you don't belong," or "We don't want you making any sales there," or something to that effect.

[Monsanto's counsel]: Objection, Your Honor. That is not responsive. It goes beyond the question.

The Court: I will let the answer stand.

Q. What individuals at Monsanto or who were employed by Monsanto talked to you concerning this possible sale to the onion grower in New York?

A. I have a strong feeling it would have been Max Albertson.

Q. And he is the one who communicated the reasons that you stated for not being able to make that sale? A. Yes, sir.

In addition to this evidence relating to the way in which Monsanto's shipping policy change acted as a coercive tool for enforcing its primary area of responsibility contract with its distributors, there was clear evidence that its "Dealer Compensation Program" was a cooperative program amounting to a "contract, combination * * * or conspiracy" which had the effect of restricting customers. In answer to one of Reed's interrogatories, for example, Monsanto stated:

Monsanto compensates its herbicide distributors who *elect to participate* in Monsanto's distributor marketing program, and who qualify for such compensation under the program. [Emphasis added.]

At trial, Alan Davis, a Monsanto official, testified on cross-examination:

Q. Now, can you tell me, Mr. Davis, if since the crop year 1972, all of the Monsanto contract distributors have participated in the early shelving and compensation for dealer information aspects of your distributor marketing program? A. No, they haven't.

Q. Can you tell me who hasn't? A. I believe American Oil didn't qualify in 1973, and W. R. Grace one year, I'm not sure. I think it might have been '72.

Q. Did you say American Oil didn't qualify? A. Yes.

Q. What do you mean by that? A. They didn't submit the information for compensation under the sales information part of the program.

Q. All the other distributors did? A. No, I can't say all of them did. We have over 110 or 115 distributors. I'd say on various aspects of the program, maybe on sales information, 90 per cent did.

■ We conclude that there was sufficient evidence in the record for the jury to have found a "contract, combination * * * or conspiracy" between Monsanto and its distributors both as to the alleged territorial restrictions and as to the alleged customer restrictions. The district court instructed the jury at length on this essential element, and we conclude that the jury's finding on this element should have been sustained.

### B. Effect

As its second defense in support of the district court's granting a judgment n. o. v., Monsanto urges that there was no showing that it actually restricted its distributors from selling outside their areas during the post-termination period. Monsanto points, first, to Fred Reed, Jr.'s testimony in which he recounted how various distributors—in particular John Anderson—refused to deal with him because of Monsanto's rebate policy and territorial restrictions.[5] Monsanto makes much of the deposition testimony of the claimed declarants where, it is said, the distributors "flatly denied under oath that they had made the statements attributed to them by Fred Reed, denied coercion by Monsanto, and further testified they always remained ready and willing to sell to plaintiff but in some instances did not complete such sales for business reasons of their own." This somewhat overstates the testimony. Phil James, Anderson's vice-president, whose hearsay declarations via Fred Reed were most damaging to Monsanto, testified in deposition as follows:

Q. Okay, now can you tell me the substance of what you said and what Mr. Reed said during the first conversation that you remember in November of 1971 about the purchase or sale of Monsanto herbicides by you to Mr. Reed? A. As best I recollect, Mr. Reed asked for a quotation on Monsanto herbicides for another season and in the first conversation I told him I'd get back to him and honestly, in the second one, I can't recall if I quoted Fred Reed a specific figure or if at that time I told him that the margins had been low enough the previous year that we weren't really maybe (sic) in quoting another year, and I was probably intentionally vague there because I didn't want Fred, for any reason, to have any indication that we didn't want to sell him for any other reason other than it was a margin problem, and we do other business with other corporations and I was eager not to offend him or insult him.

The question of who said what to whom is obviously for the jury to determine, not the district court.

---

5. Monsanto urges that this testimony is hearsay which should have been excluded because there was no extrinsic evidence of conspiracy. Since, as we have noted above, in part IV A, substantial evidence of agreement did exist, these statements were properly admitted under the co-conspirator exception. *See South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767, 788 (6th Cir. 1970).

█ Similarly, Monsanto argues that the testimony of John Mulvihill—far and away the most damaging witness to appellee's case—should be ignored since, according to Monsanto, "there was no showing that he consciously committed himself to restrict sales to his territory or that Monsanto firmly and successfully insisted he sell only in his primary area." In support of this contention, Monsanto points to Mulvihill's admission during his testimony that he did in fact sell more than $3 millions worth of Monsanto herbicides to an out-of-territory wholesaler, Robert Van Diest, during 1972–73. It is true that Mulvihill specifically testified that he had adhered to Monsanto's restrictions in some cases, but not in others, but the weight and credibility to be given this testimony—like that of all the witnesses—was a matter for the jury to ponder.

In support of its contention that there was no unlawful effect, Monsanto places great reliance on *A. P. Hopkins Corp. v. Studebaker Corp., Onan Division, supra,* and *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974). We have examined these cases and found them to be factually distinguishable. The circumstances here are closer to those in *Interphoto Corporation v. Minolta Corp.,* 295 F.Supp. 711 (S.D.N.Y. 1969), *aff'd,* 417 F.2d 621 (2d Cir. 1969), than to those in *Hopkins* or *Chisholm Bros.*

The district court submitted to the jury, under careful instructions, the question of whether Monsanto and its distributors adhered to policies which had the effect of limiting or restricting the territories within which or the persons to whom Monsanto herbicides could be resold. The jury found such an effect, and we perceive no justification for unseating that verdict.[6]

It is true, as Monsanto points out, that the courts have approved a manufacturer's designation of areas of primary responsibility for its distributors without more, but here we have so much "more". There was credible evidence which the jury could have relied upon in determining that Monsanto's additional policies effectively curtailed the ability of its distributors to sell Monsanto herbicides after purchase to whomever they wished. It is those policies and the agreements between Monsanto and its distributors that the law condemns, not the designation of primary areas.

We hold only that a judgment n. o. v. was improperly granted where, as in this case, the jury could have found that Monsanto made rebate policies and enforced its "area of primary responsibility" contracts through shipping policies which had the effect of restricting its distributors in the resale of its products. In the circumstances of this case, these policies and agreements have effectively cut off Reed, an independent wholesaler, from his normal sources of supply for Monsanto herbicides unless he absorbs the additional freight charges arising from Monsanto's shipping policies and pays a premium to the distributor to offset the retail rebates that the distributor would lose by selling outside of the Dealer Compensation Program. Competition being what it is, such action by Monsanto has eliminated Reed from his previously enjoyed market and damaged it accordingly.

---

**6.** Monsanto urges that its shipping policy is based upon sound business considerations, i. e., inventory management principles, and that its dealer rebate program is grounded in sensible marketing principles. The Supreme Court, however, has made it quite plain in *Schwinn* that "good business practice" is no defense to a *per se* violation. The Court stated:

Our inquiry is whether, assuming nonpredatory motives and business purposes and the incentive of profit and volume considera-tions, the effect upon competition in the marketplace is substantially adverse. The promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct. It is only if the conduct is not unlawful in its impact in the marketplace or if the self-interest coincides with the statutory concern with the preservation and promotion of competition that protection is achieved. [388 U.S. at 375, 87 S.Ct. at 1863.]

*C. Damages*

■ Monsanto argues that, even if agreement and unlawful effect can be found, the proof adduced in support of Reed's damage claim is wholly speculative. We cannot agree. Reed fully set out its past record of sales, expenses, and profits, and this is generally recognized as an acceptable basis upon which damages may be ascertained in antitrust cases. *See Eastman Kodak Co. v. Southern Photo Material Co.*, 273 U.S. 359, 378–79, 47 S.Ct. 400, 71 L.Ed. 684 (1927). Nor was there anything objectionable in Reed's using an average of the preceding four years as the proper rate of profit for the year 1973. Reed had determined its overall profit rate by allocating general and administrative expenses and deducting those amounts from gross profit figures for the 1969–72 period, a method recognized as generally accepted by Monsanto's own accountant witness. As to 1973, Reed introduced testimony from its accountant witness, which could have been believed by the jury, that the actual profit figure of 0.4% for 1973 was misleading because of various artificial costs and that an average profit figure was more accurate.

In addition to this evidence, there was testimony before the jury that in 1972 and 1973 Reed was unable to buy from John Anderson, its most important source of supply in 1971; and that Reed was unable to continue selling to retailer J. D. Fleener because, after the rebate system was instituted, Fleener could buy Monsanto products direct from distributors at lower prices than Reed could, even though Reed purchased in far greater volume. As we have noted, the jury award is virtually identical to the profits for the years 1972–73, estimated by Reed to have been lost as a result of Monsanto's post-termination policies. It may be that such calculations are not absolutes, but they come within our cases, *see Arthur Murray, Inc. v. Reserve Plan, Inc.*, 406 F.2d 1138, 1146 (8th Cir. 1969), and are sufficient to raise a question for the jury to determine.

## V.

■ As a final argument, Monsanto urges that the district court's alternative grant of a motion for a new trial should be upheld. The standards for appellate court review of such questions in this Circuit have been ably discussed by Judge Lay in *Fireman's Fund Insurance Co. v. AALCO Wrecking Co.*, 466 F.2d 179, 185–88 (8th Cir. 1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973). When a verdict is set aside because evidence was erroneously admitted or where the trial court has erred in instructing the jury, it is generally thought appropriate to uphold the granting of a new trial as being peculiarly within the discretion of the trial judge, since he is considered in a better position to correct a manifest injustice, 466 F.2d at 186. A different situation exists, however, where the grant is based on the district court's appraisal of the evidence, for we must ever be sensitive that the trial judge not interfere with the role of the jury as trier of fact. In this regard, Judge Lay stated in *Fireman's Fund* that:

> Regardless of the rhetoric used the true standard for granting a new trial on the basis of the weight of the evidence is simply one which measures the result in terms of whether a miscarriage of justice has occurred. [466 F.2d at 187.]

■ Turning to the ruling in this case, we find that the district court granted the motion on three grounds: (1) for the same reasons as those upon which the judgment n. o. v. was based; (2) that the verdict was against the "clear weight" of the evidence; and (3) that the issues involving Monsanto's shipping and rebate policies should have been submitted to the jury under the rule of reason. Taking these in reverse order, we reject the suggestion that the jury should have been instructed to apply a rule of reason approach to Monsanto's shipping and rebate policies. Whatever their appellation or garb, policies

which have the effect of being unlawful territorial and customer restraints are *per se* violations of the Sherman Act, *Schwinn, supra*, 388 U.S. at 379, 87 S.Ct. 1856, 18 L.Ed.2d 1249. The instructions were correct as given, and it was an abuse of discretion for the district court to have granted a new trial on the ground that different instructions should have been used.

 As to the first and second grounds which relate to the evidence, we have set forth the background of this case above, and we are hard pressed to say that a miscarriage of justice occurred at the trial when the jury returned a verdict in favor of Reed. The evidence was such that reasonable men could differ as to result, and there existed no significant weight factor favoring Monsanto. Under those circumstances, the jury determination should have been left standing. Therefore, the alternative grant of a new trial was improper.[7]

### VI.

We are satisfied that there was sufficient evidence in the record to sustain a finding that Monsanto had violated the Sherman Act and damaged appellant. Accordingly, we reverse the judgment of the district court granting judgment n. o. v. and, in the alternative, a new trial, and order that the jury verdict be reinstated.

Reversed and remanded.

---

7. Monsanto additionally argues in support of the grant of a new trial that the admission of various evidence—"the hearsay statements purportedly made by other distributors; the unsupported opinion testimony of plaintiff's claimed expert witness, Dr. John Coppett; and the damage exhibits"—was erroneous and justifies setting aside the jury verdict. These grounds were not mentioned by the district judge, but, in any event, we find them meritless.